[No. 916.]

## STATE OF NEVADA, RESPONDENT, *v.* JAMES TICKEL, APPELLANT.

CRIMINAL LAW—DEPOSITIONS ON PRELIMINARY EXAMINATION—IMPEACHMENT OF WITNESS AT TRIAL.—When the deposition of a witness has been taken on preliminary examination, and the witness is present at the trial: *Held*, that the deposition may be used for the purpose of impeaching the testimony of the witness.

IDEM—COURT CANNOT INSTRUCT JURY AS TO FACTS.—The question whether a witness is unworthy of belief is to be decided by the jury upon the evidence, without comment or instructions by the court upon questions of fact.

IDEM—REMARKS OF THE COURT.—During the trial the court asked a witness: "Don't you ever make mistakes in taking down testimony in a justice's

court?" and after the reply: "It may be possible, your honor, but we try not to," made the remark, in the presence of the jury: "Well, if you don't you are the first justice of the peace I ever heard of who does not make a mistake occasionally:" *Held*, that the remarks were in substance and effect an instruction to the jury upon questions of fact, and were in violation of defendant's constitutional rights.

INSTRUCTION—REAL OR APPARENT FACTS.—An instruction to the jury that, in considering whether or not the defendant was guilty, it was their duty to carefully scrutinize all the testimony in the case, and not to be misled by apparent, but not real, facts, is not calculated to mislead the jury.

IDEM—MALICE—ASSAULT WITH INTENT TO KILL.—An instruction which is so worded as to convey the idea that "malice or deliberate purpose on the part of the defendant" is a necessary element of the crime of assault with intent to kill: *Held*, erroneous.

APPEAL from the District Court of the Sixth Judicial District, Eureka County.

The facts are stated in the opinion.

*Thomas Wren and Crittenden Thornton*, for Appellant.

I. Depositions taken in a criminal case on preliminary examinations, prove that the testimony which purports to have been given, in fact, was given. The only point open to denial is the identity of the person making the deposition. (Roscoe's Crim. Evid. 73; *Rex* v. *Wylde*, 6 Carr. & Payne, 380; 25 E. C. L. 346, cited Roscoe, 816, 817; *Rex* v. *Thornton*, cited 2 Russell on Cr. 894 in notes; 2 Phill. Ev. 235–37; 1 Green. Ev., secs. 227, 275, 277.) The depositions, when returned to the custody of the clerk of the district court, under the certificate of the justice, become judicial records, and as such, parol evidence is not competent to vary or contradict them, or impeach their correctness. (*Brintnell* v. *Foster*, 7 Wend. 103; *McLean* v. *Hugarin*, 13 Johns. 184; *Posson* v. *Brown*, 11 Id. 166; *Hard* v. *Shipman*, 6 Barb. 621; *Smith* v. *Compton*, 20 Id. 268.)

II. The comments of the judge upon the facts were wholly unjustifiable and palpably erroneous. (*McMinn* v. *Whelan*, 27 Cal. 300; *People* v. *Bonds*, 1 Nev. 35; *State* v. *Millain*, 3 Nev. 469; *State* v. *McGinnis*, 5 Id. 337; *State* v. *Ah Tong*, 7 Id. 148; *State* v. *Harkin*, 7 Id. 383; *People* v. *Levison*, 16 Cal. 98; *People* v. *Ah Fung*, 17 Id. 379; *People*

v. *Williams*, 17 Id. 142; *People* v. *Strong*, 30 Id. 151; *People* v. *Dick*, 37 Id. 279.)

*John R. Kittrell, Attorney-general,* for Respondent.

I. There was no error in admitting the testimony of Mrs. Demery. (1 Green. on Ev., sec. 275.) The remarks of the court were not calculated to influence the verdict of the jury.

II. An indictment for an " assault with intent to kill," will support a conviction for " assault with a deadly weapon with intent to inflict a bodily injury." (*Robey's case*, 8 Nev. 312; *People* v. *Davidson*, 5 Cal. 134; *People* v. *English*, 30 Id. 217; 22 Wend. 167; 17 Id. 386; 3 Hill, 93; 5 Porter, 523; 7 Id. 475; 5 Ala. 477; *People* v. *Vanard*, 6 Cal. 563.)

By the Court, LEONARD, J.:

Appellant was indicted for an alleged assault with intent to kill one Hugh Kelly. The result of his trial was a conviction for an assault with a deadly weapon with intent to inflict upon the person of said Kelly a bodily injury. This appeal is from the judgment, and from an order overruling appellant's motion for a new trial.

There was evidence on behalf of the state tending to prove that on the morning of the ninth day of February, 1877, at about eleven o'clock A. M., at Ruby hill, in Eureka county, appellant and one Hugh Kelly became engaged in a controversy which arose in the following manner: Kelly and one Madden, at Smith's saloon, were playing a game of cards, which terminated in a fight. When Kelly was down and being worsted, appellant intervened and took Madden off. Kelly, who had been drinking to some extent, asked appellant, with an oath, whether *he* wanted any of it. Appellant replied that he did not. Kelly held in his hand a miner's candlestick, with which he violently gesticulated. Appellant picked up a stick and raised it to strike Kelly, but did not deliver the blow. Kelly then turned and walked away to Werry's lodging-house, where he roomed. Appellant dropped his club and immediately went to the same house.

There was also testimony to show that Kelly was a miner

and had come off his shift about one o'clock in the morning; that appellant went up to the upper story of Werry's house, and after pushing in the door of Kelly's room, shot Kelly in the shoulder, producing a serious wound.

Mrs. Kate Demery testified on behalf of the state as follows:  "I was present near Smith's house on the morning of the affray between Tickel and Kelly; shortly after, Kelly turned and went to Werry's house, where he lodged; I saw a man give Tickel a pistol; the defendant then started toward Werry's house, after putting the pistol in his pocket, when a man in the crowd, addressing him, called out: 'Come back, Jimmy;' to which Tickel replied: 'Let me alone; I'll fetch him,' and immediately started toward Werry's house; I afterwards heard the shot, and saw Tickel returning up the street."

Upon cross-examination the witness was asked if she recognized a document shown her as her testimony given before L. W. Cromer, justice of the peace, sitting as a committing magistrate in this case, to which she replied that she did. Appellant's counsel then pointed out to the witness the language in the deposition referred to, and asked her if she had not sworn at such examination that a man in the crowd said: "Let him go," and another man said: "Let him go; he'll fetch him." The witness answered: "I never swore so; if so written, it was a mistake."

On re-direct examination, the district attorney asked the witness whether the justice had not made a mistake in taking down her testimony in respect to the person who used the language written in the deposition in regard to which she had been cross-examined.

Appellant's counsel objected to the question upon the ground that parol evidence was not competent to vary or contradict a deposition read over, signed and sworn to by the witness, and also moved the court to strike out the answer to the previous question on the same ground. The court overruled the objection and denied the motion to strike out. Exceptions were taken, and the witness answered as she had done to the preceding question.

The deposition and testimony referred to, properly signed

by the witness and certified by the justice, were then put in evidence without objection. This was the testimony of the witness at the preliminary examination, as appears from the deposition: * * * " I was standing at the door of my house at the time the difficulty between Tickel and Kelly occurred; I saw Kelly with a candlestick (to the best of my belief) going backward towards Nick Werry's saloon; a man came out and gave Tickel a shooter; Tickel walked ·down fast after Kelly; one man said ' Don't let him go;' another said ' Yes, let him go; he'll fetch him;' * * * I did not hear Tickel say anything, but heard some [one] say: ' He'll fetch him.'" On cross-examination it appears that witness stated that she did not hear Tickel say anything at the time Kelly was backing down the street.

L. W. Cromer, the justice before whom the preliminary examination of appellant was had, testified that the testimony of Mrs. Kate Demery, as set forth in the deposition before mentioned, was taken down in his presence by Marshall Attwood, acting as his clerk, and when taken down was read over to the witness, assented to by her as correct, and her mark affixed thereto in his presence, and that he believed the deposition correctly stated the testimony of the witness given before him on appellant's preliminary examination. Attwood testified in effect the same.

The court, of its own motion, asked the last named witness the following question: " Don't you ever make mistakes in taking down testimony in a justice's court?" The witness answered, " It may be possible, your honor, but we try not to." Whereupon the court replied: " Well, if you don't, you are the first justice of the peace I ever heard of who does not make a mistake occasionally."

One of the appellant's counsel then testified that he took full notes of the testimony of Mrs. Demery at the preliminary examination, and he found that his notes, which he produced, corresponded entirely with the deposition returned into court by the justice of the peace.

Appellant made himself a witness at the trial. He admitted shooting Kelly in the hallway leading to his (appellant's) room in Werry's house, but claimed that he acted in

self-defense.   He testified that he was a miner, and at the time of the affray was at work on the night shift on Ruby hill; that he had quit work about an hour before the difficulty with Kelly; that he had for two weeks prior to that time roomed at Werry's; that he had not slept at all during the preceding night, and was going to his room for the purpose of going to bed, and for no other purpose; that he had no intention of meeting, seeking or encountering Kelly, or of provoking a fresh quarrel, or continuing the previous one; that he met Kelly in the hallway which lead to appellant's room, and was in the act of passing Kelly, when the latter raised his candlestick and made a stab at him, which he avoided by leaping aside; that Kelly then raised his hand to make another stab at him, when he fired and shot Kelly through the shoulder; that in so doing he was under the belief that it was necessary for him to fire in order to save his life or to protect himself from great bodily harm from Kelly; that he did not shoot Kelly in his room, nor push in the door of the room, but that the whole occurrence happened in the hallway.   There was testimony admitted on behalf of appellant that a miner's candlestick was a sharp instrument, capable of inflicting a deadly wound; that to the knowledge of the witnesses, men had been killed by stabs inflicted by such instruments, although they were ordinarily used for the purpose of lighting mines.

The transcript does not contain all the evidence produced on the trial.   Four alleged errors are discussed and insisted upon by counsel for appellant: 1. It is urged that the court erred in refusing to strike out the answer of Mrs. Demery, " I never swore so; if so written it was a mistake," given in reply to the question propounded by appellant's counsel on cross-examination whether she did not swear differently at the preliminary examination.

The statute provides that, depositions taken at preliminary examinations as therein required " may be used by either party on the trial of the cause, and in all proceedings therein, when the witness is sick, out of the state, dead, or when his personal attendance cannot be had in court." When the witnesses are present at the trial, as in this case,

depositions may be referred to by counsel for their conven-
ience, and they may be used for the purpose of impeachment
in case of discrepancy between testimony given upon the
trial and that taken down by the examining magistrate.
For the purposes of the trial we know of no other use to
which they can be put. For the purpose of discrediting Mrs.
Demery, by showing a discrepancy upon a material point
between her testimony given at the preliminary examination
and on the trial, she was asked a question by appellant's
counsel which was susceptible of one of two answers only.
She was able to say that she did so testify before the mag-
istrate, or that she did not. Her answer was fully respon-
sive to the question whether true or false, and whether the
one or the other, it was not incompetent. It is at least
doubtful that appellant had the right to ask the witness
as to the contents of the deposition, or as to what she testi-
fied at the preliminary examination, the deposition itself
being presumptively the best evidence of either fact. (*The
Queen's Case*, 2 B. & B. 287; *Newcomb* v. *Griswold*, 24 N. Y.
298; *Lightfoot* v. *The People*, 16 Mich. 512; *Gaffney* v. *The
People*, 50 N. Y. 423; 2 Phill. Ev. 962.)

But as was necessary and proper, the deposition was
shown to the witness, who had an opportunity to examine
the same, and no objection was made to the question asked.

Had the witness answered that she did testify before the
magistrate, as stated in the deposition and as asked by
counsel, the deposition could not have been introduced in
evidence at the trial. "The rule is clear that where a wit-
ness admits the statement alleged, no other proof of his
having made it, is allowable." (*Lightfoot* v. *The People
supra.*) But inasmuch as she answered that she did not so
testify, appellant was required and permitted to introduce
the deposition which the law presumes contained all the
testimony given by her before the magistrate. Whether or
not it would have been competent on the part of the state to
rebut the legal presumption of correctness in the deposition,
after it was admitted in evidence, or whether appellant was
entitled to an instruction to the jury that such deposition
was conclusive evidence of the facts testified to before the

magistrate, cannot be decided at this time for the reason that the record does not justify an examination of the proposed questions.

For the purposes of this appeal it is sufficient to say that it was not more incompetent for the witness, on cross-examination, to deny making the statement embodied in the deposition and sent to the trial court, than it would have been to deny making the same statement verbally out of court. The method of proving the discrepancy only would be different in the two cases. And whether or not the court should have ordered the words of the witness, "If so written it was a mistake," stricken out, because not responsive to the question, or for any other reason, had a motion been made to strike out such words alone, is not before us, because that motion was not made. It certainly was not error to refuse to strike out the whole answer of the witness upon the grounds stated. Besides, the conclusion of the witness expressed by the words, "If so written it was a mistake," necessarily followed if her denial of testifying as asked by appellant's counsel was in fact correct; and the expression by her of that opinion or conclusion was entirely harmless. If she had testified before the magistrate as appeared in the deposition, then her words, "If so written it was a mistake," fell of their own weight; and if she had not so testified in fact, then they were inevitably true, whether she expressed them or not. In other words, a simple denial on her part would have performed the same office as was performed by her whole answer.

The question asked by the district attorney, on re-direct examination, whether the justice had not made a mistake in taking down her testimony, was entirely useless, but at any rate it was harmless in its results, because the question and answer were merely a repetition of what had already been stated by the witness on cross-examination by appellant's counsel. The first assignment of error is not well taken.

2. It is next claimed by appellant that the court erred in asking witness Attwood the question: "Don't you ever make mistakes in taking down testimony in a justice's court?" and after the reply of the witness, in remarking in the presence

of the jury, "Well, if you don't, you are the first justice of the peace I ever heard of who does not make a mistake occasionally."

It cannot be denied that it was important for the state to maintain the integrity of the witness Demery, and that it was just as important for the defense to impeach her. To accomplish the former, it was necessary for the state to make it appear evident to the jury, that the apparent discrepancy in her testimony was the result of a mistake on the part of the justice, rather than falsehood on the part of the witness. On the other hand, to impeach her credibility it was necessary for appellant to present to the jury the deposition as a document, which was, in fact, what it purported to be. Whether or not appellant had succeeded in showing the witness to be unworthy of belief, was a question to be decided by the jury upon legal proofs admitted without comment or instruction by the court upon questions of fact. It is true the court did not address the jury personally, but it might as well have done so, for no one else had aught to do with the question of fact then before the court, and no one else could have been influenced against appellant, or in favor of the state by the remark. It is entirely natural that jurors do, and proper that they should, listen attentively to, and be greatly influenced by, all remarks of the court. They have the right to confide in its expressed opinions, and it is their duty to obey its legal instructions. It may be said that jurors are presumed to know the law, that the court has not the right to instruct them or give its opinions upon questions of fact, and that, therefore, they ought not to be, and will not be, influenced thereby. In my opinion experience does not justify such conclusion; but at any rate, courts cannot presume against the natural result of remarks or instructions improperly made. If the court in this case had informed the jury that it had no right to comment or instruct them upon questions of fact, and that they must not be influenced by what it might say, still its expressed opinion must have influenced them. They would have known the opinion of the court then as now, and it would have left its impression upon

their minds, however hard they might have tried to escape it. Appellant had the right to try to impeach the witness Demery, and the further right to have any evidence admitted for or against that effort, to go to the jury unaffected by the court's opinion. On the contrary, the jury were told in this case, upon a material issue, that justices of the peace were not only liable to make mistakes like the rest of mankind, but that, to the knowledge of the court they did so make them. The language used naturally conveyed to the minds of the jury the impression at least, if not the conviction, that they were justified in looking at the returns of justices in criminal cases with suspicion. But, worse than all, the court's words naturally left the impression upon the minds of the jury that because other justices had made mistakes, to the knowledge of the judge, therefore Justice Cromer might have made a mistake in this case. The inference was far-fetched and unjustifiable. It is enough for any man to sustain the consequences of his own mistakes, without being made responsible for those of his entire guild.

In *The People* v. *Bonds*, 1 Nev. 36, the court say: "There is nothing in the point made by respondent's counsel that this was not a formal instruction, but merely a remark made to counsel. Such a remark, made by the presiding judge in the hearing of the jury, would have precisely the same effect as if given as a formal instruction."

In *The State* v. *Ah Tong*, 7 Nev. 152, it is said: "Under our practice the judge should intimate no opinion upon the facts. If he cannot do so directly, he cannot indirectly; if not explicitly, he cannot by innuendo; and the effect of such an opinion cannot be obviated by announcing in distinct terms the jury's independency of him in all matters of fact." (2 Winston, 47.) One object is stated to be to guard against the well known proneness of jurors to seek to ascertain the opinion of the judge and to shift their responsibilities from themselves to the court.

In *The State* v. *Harkin*, 7 Nev. 381, the trial court, in overruling an objection to certain testimony, remarked in the presence of the jury, "that there was as much testimony that defendant had kicked deceased upon the chest

as upon the face." After the testimony was all in, and before the argument of counsel, the court informed the jury that in making the remark above stated it was simply ruling upon the objection as it was made; that the court did not wish it understood as saying how much or how little testimony there was upon any particular point; that the whole matter was for the jury to pass upon, and that they would observe for themselves what the testimony was. But the court did not retract its opinion formerly expressed. The remarks in that case, as in this, were not delivered directly to the jury, as though an oral charge was being delivered to them, but the court then spoke and acted more directly to the counsel for defendant, while in this case the court directly addressed the witness alone. Whether counsel or witness was addressed, and not the jury, is a matter of no consequence. The effect upon the jury was the same. In the *Harkin case* this court said: "It is evident that the opinion of the court can be as effectually conveyed to the jury by expressing it in their hearing, while ruling upon an objection to evidence, as by embodying it in what purports to be a declaration of the law for their instruction. Accordingly, and we think correctly, it has been held that the judge has no more right to volunteer before the jury his opinion upon a material fact in controversy while deciding a question of law on the trial, than he has to charge the jury in respect to such fact. * * * The right to a decision on the facts by a jury uninfluenced and unbiased by the opinion of the judge, has been deemed worthy of a constitutional guarantee. It cannot be lawfully denied by the simple evasion of looking at the jury, or foisting the opinion into a ruling upon the testimony.

In *McMinn* v. *Whelan*, 27 Cal. 319, a civil case, the lower court expressed its opinion upon the respectability of a witness under examination, and the appellate court said: "We should not hesitate to reverse the judgment because of it, if the same depended in any material degree upon the testimony of the witness whose character and standing were thus indorsed."

In our opinion the remarks complained of were in sub-

stance and effect an instruction to the jury upon questions of fact, and that they were made in violation of one of appellant's constitutional rights.

3. The remaining assignments of error relied upon are the giving of the ninth instruction by the court, and the refusal to give the third instruction asked by appellant. By the third instruction given by the court, the jury were told that if appellant acted in self-defense he should be acquitted. By the eighth they were instructed that they were to judge whether or not, at or immediately preceding the moment of shooting, appellant was in fear of losing his life or receiving bodily injury from Kelly, and reasonably thought a miner's candlestick was a deadly weapon, and that Kelly intended to kill him or inflict upon him a bodily injury; that if they so thought, the plea of self-defense could be considered by them. The ninth instruction, of which complaint is made, reads as follows: "In considering the plea of self-defense it is the duty of the jurors to carefully scrutinize all the testimony, and not to be misled by apparent and not real facts, or inferences to be drawn from such facts."

It is claimed by appellant that by the instruction quoted, the jurors' minds were directed against the defense alone; that by it there was an intimation that the defense had been made upon apparent but not real facts; in other words, that appellant's testimony, and that given in his behalf, was not what it purported to be—that it was false. It should be borne in mind that there was testimony both for and against appellant's claim of self-defense. In fact, the only real issue in the case was whether or not the shooting, which was admitted, was done in self-defense. Such being the case, when the court used the words, "In considering the plea of self-defense," etc., it was the same as saying, "In considering this case," etc. We do not think the jury could have understood the court as intimating that the defense had introduced evidence of facts that were apparently so, but really were not as claimed. Inasmuch as the evidence was very conflicting upon the question of self-defense —the only one in the case—it is evident that there was, on one side or the other, what the court was pleased to call

apparent, but not real facts. The jury were, therefore, told that in considering the plea of self-defense—that is, in considering whether or not appellant was guilty, it was their duty to carefully scrutinize all the testimony in the case, and not to be misled by apparent, but not real facts. We do not think the jury could have been misled by the instruction.

The court did not err in refusing the third instruction asked by appellant. As presented it might have misled the jury. From it they might have gathered the idea, that "malice or deliberate purpose on the part of the defendant" was a necessary element of the crime of assault with intent to kill, which is not the fact. (*State* v. *O'Connor*, 11 Nev. 424.) In the form presented the instruction was inapplicable to the case.

If appellant went to his room under the circumstances stated in the instruction refused, it would have been entirely proper to have informed the jury that his going there was not evidence against his claim of self-defense. Had such an instruction been asked it would doubtless have been given, particularly in view of the court's sixth instruction. The judgment is reversed and the cause remanded for a new trial.