# Payne *v.* The State.

### Indictment for Murder.

1. *Change of venue, on account of incompetency of presiding judge of circuit.*—When application for a change of venue in a criminal case, on account of the incompetency of the judge of the circuit to preside, is made in vacation, under the provisions of the act approved January 26, 1875, and is refused by him, on the ground that he has made arrangements with the judge of the adjoining circuit to preside in his place at the next term ; this furnishes no reason why the presiding judge at the next term, not being disqualified to sit in the cause, should continue it, or decline to try it.

2. *Same.*—The act approved January 26, 1875, entitled "An act to provide for a change of venue in certain cases" (Sess. Acts 1874-5, p. 231), is superseded and repealed by the constitutional provision on the same subject, contained in the 18th section of the 6th article of the constitution of 1875.

3. *Threats by deceased against prisoner; when not admissible.*—In a case of homicide, where no question of self-defense arises—as where the prisoner, having had a quarrel with the deceased, rode off several miles, and procured a gun, and followed the deceased from place to place, and attacked him when they met, and shot and killed him, the deceased having no weapon in his possession—threats made by the deceased against him two weeks previously, and communicated to him, are not competent evidence for the prisoner.

4. *Impeaching witness, by proof of contradictory statements.*—A witness may be impeached in a criminal case, by proof of contradictory statements made by him on an application by the prisoner for bail; although, when cross-examined as to such statements, he says "he does not remember whether he said so or not."

FROM the Circuit Court of Colbert, on change of venue from Lauderdale.

Tried before the Hon. WM. S. MUDD.

The prisoner in this case, George W. Payne, was indicted for the murder of John Edward Smith. The indictment was found in the Circuit Court of Lauderdale, at its April term, 1874; and the trial was removed, on the application of the prisoner, at the same term, to Colbert county. After several continuances, the prisoner presented his written petition, under oath, to Hon. W. B. WOOD, the presiding judge of the 4th judicial circuit, which embraces the counties of Lauderdale and Colbert, asking that the case might be sent to another circuit for trial, under the provisions of the act approved January 26, 1875, entitled "An act to provide for a change of venue in certain cases" (Session Acts 1874-5, pp. 231-32), on the ground that Judge Wood was incompetent and disqualified to preside on the trial, being the uncle by blood of the deceased. This petition was presented to Judge Wood in vacation, and was refused by him, his indorse-

ment on it being in these words : "The prayer of the petition is refused, because I have arranged with Judge Mudd to hold court for me in Lauderdale and Colbert counties." At the ensuing term, when the case was called for trial before Judge Mudd, "the defendant moved the court for a continuance of the trial, and insists that this court should not try this cause, and moves the court to decline doing so ;" and proved to the court, in support of these motions, his said application to Judge Wood. The court overruled the motions, and required the trial to proceed ; to which rulings the defendant excepted.

"On the trial," as the bill of exceptions states, "it was proved that the defendant killed John Edward Smith, by shooting him with a double-barreled shot-gun, on the 29th December, 1873, in Lauderdale county, Alabama. The proof showed that, early in the morning of that day, the defendant went to the house of Bud Arnold, where the deceased boarded, which was about two miles from where the defendant lived ; and a witness stated, that the deceased afterwards told him 'that he ran the defendant out of Arnold's house, and said that defendant should not sit by a fire he had made.' The proof then showed that, after the difficulty at Arnold's, the defendant went to the house of one Mangum, some two miles from Arnold's, and across the line into Tennessee, and asked Mangum to go deer-hunting with him, which Mangum refused to do ; that the defendant then borrowed a double-barreled shot-gun from Mangum, and rode back to Arnold's ; that he met one Carson in front of Arnold's, and asked him where the deceased was ; that Carson told him he had gone off up the road, with one Hitchcock, to Ham Rhodes's gin-house ; that the defendant then called to Mrs. Arnold, and asked where the deceased was ; that she informed him the deceased had gone down to the bottom to hunt for cattle, and told him she did not want him to have any difficulty with the deceased ; and that he replied, 'That was not his way.' She told him, also, that she was fixing the clothes of the deceased, and he was going off home the next day. Defendant said to her, that the deceased 'would leave sooner than to-morrow ;' and that he 'would always think hard of Bud Arnold for keeping such a man as Smith about his house.' The defendant, the proof further showed, then rode up the road, in the direction of Rhodes's gin-house, and stopped at the house of Mrs. Brown.

"Mrs. Brown testified, on the part of the State, that on the morning of the 29th December, 1873, the defendant came to her house, which was about two miles from Bud Arnold's, and hitched his horse in the yard, and came into the house ;

that he had a double-barreled shot-gun; that he took a seat by the fire, after passing the usual salutations, and she jest-ingly asked him why he was carrying a gun; to which he replied, 'it was christmas times.' Witness had learned that defendant was going to move, and asked him when he was going to move; to which he replied, that 'he expected to move next week, if the load in his gun did not force him to leave sooner." Defendant asked her, if Hitchcock had gone up the road that morning; and she replied, 'yes.' Defend-ant then asked, if Smith was with him; and she replied that he was. Defendant then said, 'I hear them coming down the road now;' and went out of the room, and hailed Hitch-cock, who came riding down the road in front of the house, in company with the deceased. When Hitchcock was hailed, he and the deceased both checked up, or stopped their horses in front of the gate, and both sat on their horses. Defendant and Hitchcock passed the usual salutations, and defendant then said to the deceased, 'Do you want anything out of me this morning?' and about the same time raised his gun towards the deceased. The deceased said, 'Don't shoot,' and got down from his horse, about ten or twelve feet from the gate. Witness then turned away into the house. She heard the gun fire, and found afterwards the deceased was shot in the breast: he was killed, and fell across the gate-way, just outside of the gate. Defendant then got on his horse, and rode off, at first slowly, but after a little while he quick-ened his pace.

"Hitchcock was examined as a witness by the State, and stated that, on the morning of the killing, he rode to Arnold's house, and found the deceased trembling and excited, and asked him if he was cold. Deceased said, that he was mad, and that he had run the defendant out of the house that morning. Witness said, 'Eddie, perhaps you ought not to have done so.' Deceased said, 'Dr. Payne should not sit by a fire he had made.' Witness and deceased then rode to the gin of Ham Rhodes, and on their return came to the house of Mrs. Brown, which was on the road between the gin-house and Arnold's. As they came riding down the road that passed in front of the house, the defendant stepped out on the piazza, and said, 'Good morning, Jeff, dont you want to go driving to-day?' Witness replied, 'No, I have to go down in the bottom, and haul some cord wood.' About that time, the defendant got pretty near, and to the fence, which was about eight or ten paces from the door of the house. Defendant said to the deceased, '_Do you want anything out of me this morning?_' and raised his gun. Deceased said, '_Come out into the road_'; and he said something else that witness

did not understand. Witness then said, 'Let us have no fuss here this morning, boys.' Defendant had his gun raised, when witness said, 'Don't shoot.' By that time, the deceased had got off his horse, and the gun fired. Deceased said, 'Don't shoot any more,' and stepped forward about ten steps, and eased down on his knees, and fell dead across the gate-way, just outside the fence. Witness stated, that when deceased got off his horse, he *sorter* moved his horse rather between him and defendant; that defendant stepped around, and fired; and deceased stepped ten steps, and fell. Witness stated, also, that he saw no arms about the deceased; that he went off, after the deceased was killed, and got persons to assist in taking care of the body of the deceased; and that they found a small pocket-knife in his pocket. The deceased was eighteen or nineteen years old. It was shown that, after he was shot, he fell across the gate-way; that the defendant led his horse out at the gate, and over the legs of the deceased, and rode off slowly, but further on was seen going in a lope; and he was afterwards arrested by an officer, about daylight one morning, at Ripley, Mississippi. It was shown, also, that from the time defendant was first at the house of Arnold in the morning, to the time when deceased was killed, was about two hours.

"The defendant then offered to prove, by Andrew Lamb and Andrew Carson, that they were at the defendant's gate, about two weeks before the killing, when the deceased came out of the defendant's yard, and told them he had gone into the defendant's house with the intention of beating his brains out; that the deceased was armed with a pistol and a club, and said he had run defendant out of his house; which fact occurred, and which threats were communicated to defendant, about two weeks before the killing. To the admission of this evidence the State objected, and the court sustained the objection; to which the defendant excepted. During the farther progress of the trial, the defendant's counsel asked said Hitchcock, a witness for the State, if he did not testify on the defendant's application for bail, that the deceased got off his horse and said, 'Come out into the road,' before the defendant raised his gun; to which he replied, that he did not remember whether he said so or not. Defendant then introduced one Hendrix, and proposed to prove by him that said Hitchcock did state, on the trial for bail, that deceased got off his horse and said, 'Come out into the road,' before the defendant raised his gun; to which evidence, as proposed, the State objected, and the court sustained the objection; to which ruling and action the defendant duly excepted.

"Upon the foregoing evidence, the court gave the follow-

ing charge in writing, with other charges: 'If the jury believe, from the evidence, that the defendant and the deceased had a difficulty in the morning, at the house of Bud Arnold, in which the deceased forced the defendant to leave the house; and that the defendant, after said difficulty, went off to the house of Mangum, and borrowed a double-barreled shot-gun, with the intention to shoot and kill the deceased; and that, in pursuance of such intention, he went to the house of Mrs. Brown, some hours after procuring the gun, and then and there, in the manner, and under the circumstances testified to by Mrs. Brown and Hitchcock, shot and killed the deceased—then the killing was murder; and if the killing was willful, malicious, deliberate, and premeditated, it was murder in the first degree; but, if it was not willful, malicious, deliberate, and premeditated, it was murder in the second degree. And in determining what the intention of the defendant was in procuring the gun, and whether he killed the deceased in pursuance of said intention, the jury may look to the fact that there was a difficulty between the deceased and the defendant that morning, if such be the fact, and also to the acts and words of the defendant at the time he borrowed the gun, and to what was said and done by him after procuring the gun, and prior to the time of the killing, and to all the circumstances connected therewith, and also what the defendant did after the killing, as the said acts and words may have been proved by the testimony of the witnesses.' "

The defendant excepted to this charge, and then requested the court to give the following charge, which was in writing: " If the jury believe, from the evidence, that on the morning of the homicide, and two hours before the homicide, there had been a difficulty between the deceased and the defendant; and that the deceased stopped at Mrs. Brown's house, and without having explained his visit, said to the defendant, in answer to the question, ' *Do you want anything out of me this morning?*' ' *Come out into the road;*' and that the parties were at that time distant from each other about twelve feet, or the length of a fence rail; and that contemporaneously the deceased dismounted from his horse, and the defendant raised his gun; and that after the deceased got off his horse, and that (?) if he was moving around the neck of the horse, and was found, after the shot which resulted in his death, lying across the gate-way of the passage leading into the yard of Mrs. Brown, at whose house it was admitted he was killed, distant (?) from the place where, just before the killing, he was last seen, taken in consideration with all the circumstances of the case,—are facts to which the jury may look, in

[Payne v. The State.]

determining whether the defendant, in killing the deceased,
acted under the reasonable impression that his life was
threatened, or that his person was in danger of great bodily
harm ; and that if such was the danger, or under the circum-
stances the defendant had reasonable cause to believe so,
whether the danger was actual or not, the defendant had the
right to defend himself by shooting, even though it resulted
in the death of the deceased, and that the defendant is not
guilty of any offense." The court refused this charge, and
the defendant excepted to its refusal.

O'NEAL & O'NEAL, for the prisoner.—1. The judge of the
fourth circuit was incompetent, on account of his relation-
ship to the deceased, to preside on the trial of the case, or
to make any order in reference to it, except to order its
transfer to another circuit, on the filing of the petition ask-
ing such transfer. The terms of the statute are imperative,
and gave him no discretion in the matter; and he can not
be permitted to evade the statute, by selecting another judge
to preside for him.—*Ex parte Banks*, 28 Ala. 28; *Etheridge v.
Hall*, 7 Porter, 47 ; *Ex parte McCrary*, 22 Ala. 65 ; *Vaughn v.
Robinson*, 22 Ala. 519 ; *McCauley v. The State*, 26 Ala. 135 ;
*Pulliam v. Owens*, 25 Ala. 492 ; 6 Cranch, 312 ; 16 Peters, 97 ;
10 Grattan, 658; *Ex parte Echols*, 39 Ala. 698 ; *Bartlett &
Waring v. Morris*, 9 Porter, 266.

2. The threats of the deceased, as offered in evidence,
were competent evidence, and ought to have been admitted.
*Holler v. The State*, 37 Indiana, 57, or 10 Amer. R. 74 ; *Cor-
nelius v. Commonwealth*, 15 B. Monroe, 539 ; *Campbell v. Peo-
ple*, 16 Illinois, 18 ; *Keener v. The State*, 18 Geo. 194 ; *Wig-
gins v. People*, 3 Otto, 465 ; *People v. Lamb*, 2 Keyes, 466 ;
*Powell v. The State*, 19 Ala. 577 ; *Dupree v. The State*, 33
Ala. 380 ; *Stokes v. People*, 53 N. Y. 174 ; *People v. Scoggins*,
37 Cal. 676 ; *Monroe v. The State*, 5 Geo. 85 ; *State v. Sloan*,
47 Mo. 604 ; 2 Halst. 220 ; 19 Vermont, 116 ; 42 How. Pr. 31.

J. B. MOORE, with the Attorney-General, for the State.—1.
No question of self-defense arose in the case, and the former
threats of the deceased were not admissible for any purpose.
*Pritchett v. The State*, 22 Ala. 39 ; *Murphy v. State*, 37 Ala.
146 ; *Hughey v. State*, 47 Ala. 103 ; *Eiland v. State*, 52 Ala.
334 ; *Harrison v. The State*, 24 Ala. 67 ; 23 Ala. 28 ; 47 Miss.
581, 318 ; 9 Nevada, 58, 106, 120 ; 31 Penn. 198 ; 44 Penn. 55 ;
3 Selden, 385; 11 Geo. 615 ; 4 Iredell, 409 ; 2 Mason, 91.

2. The action of Judge Wood, on the petition for the trans-
fer of the case to another circuit, is not revisable in this pro-
ceeding. There was no objection to the competency of

Judge Mudd; and if the transfer had been made, the case would have been tried before him.

MANNING, J.—The refusal of the judge of the 4th judicial circuit to transfer this cause to a court in another circuit, when petition for that purpose was filed in vacation, under the "act to provide for a change of venue in certain cases," approved January 26, 1875, constituted no reason why the judge presiding at the trial, who was in no way disqualified, by relationship or otherwise, to sit therein, should grant the motion of defendant to continue the cause, or that to decline trying the same. The object of the enactment was to expedite trials before disinterested judges and chancellors; and this object was as well attained by the trial in Colbert county, when the presiding judge there was free from the objection alleged against the judge of that circuit, as it could have been by a change of venue to a court in another circuit. The proper mode of testing the question, whether the reason was sufficient, which was assigned by the judge of the circuit for not granting the prayer of the petition, would have been by having that particular matter presented in a proper manner to this court for its judgment thereupon. The motions made tended only to an indefinite and aimless delay.

2. In respect to the statute referred to, it was passed after the commission of the offense charged against appellant, and after the finding of the indictment. It was, therefore, subject to repeal or alteration by subsequent legislation, which in such case could not be held obnoxious to the constitutional prohibition against *ex-post-facto* laws. We think the statute was, in fact, superseded by the provisions on the same subject in section 18, article 6, of the constitution of 1875–6, and at the time of the trial was not in force.

3. In *Pritchett v. The State* (22 Ala. 39), the person slain had made threats of personal violence against the prisoner, which had been communicated to him; and on the morning preceding the day on which he was killed, the deceased had gone to the field in which the prisoner had been plowing, and with a pistol in one hand, and a rock or stick in the other, had forbid the prisoner's going to his plow. Just before the killing, the prisoner was seen starting from his house, priming his gun, picking the flint, and crying; and proceeding to the premises of the deceased, and finding him at home, he said to him in a loud voice, "Stop, I have come to shoot you." Thereupon, the deceased stopped, turned round, and was shot by the prisoner and killed. On the trial, it was proved that the prisoner was, previously, a peaceable and orderly citizen, and he proposed to prove that the person he

slew was a turbulent and quarrelsome man; which the court, upon objection of the State's solicitor, would not permit him to do. In a very carefully considered opinion, sustaining the ruling of the court below, CHILTON, C. J., speaking for the court, says; "The law, having respect to the nature of man, and aiming to arrive at the true intent and motive which characterize acts prohibited by it, allows every fact and circumstance *immediately connected with the act,* and which tends to elucidate and explain its nature, or the motive and intent which moved to its perpetration, to be given in evidence. It endeavors to adjust the measure of defense to the nature of the assault; and in doing this, it permits the *party assailed to view the assailant,* just as he is: for it is chiefly from a knowledge of the true condition of the parties, at the time the act is done, that we can arrive at the motives which may reasonably be supposed to have influenced them. . . . In such a case, the act and *status* of the actor must be taken together. Thus it is, the character of the deceased may become a legitimate subject of inquiry, as connecting itself with the transaction which it may serve to explain. But, however bad or desperate that character may be, and however many threats such person may have made, he forfeits no right to his life, until, by an actual attempt to execute his threats, or by some act or demonstration at the time of killing, taken in connection with such character or threats, he induces a reasonable belief on the part of the slayer that it is necessary to deprive him of life in order to save his own, or to prevent some felony upon his person. And when a homicide takes place under such circumstances as tend to show that the slayer acted in 'self-defense, the previous threats of the deceased, his conduct upon the fatal occasion, construed with reference to his known character, and peculiarities having relation to such conduct, and tending to explain it,—all enter into, and form parts of the transaction, and may be properly received as evidence." But, because that case was not one of self-defense, and the slayer sought his enemy and killed him, it was decided that the evidence of the character of the deceased was properly excluded.

We have quoted so largely from this thoughtful and judicious opinion, because, upon " a principle of law of much delicacy and importance," it seems to us to avoid, much better than any other we can now refer to, the two extremes— that of not tenderly enough considering the situation in which the accused was placed, on the one hand,—and on the other, that of conceding too much indulgence to undisciplined passions; which neither law nor religion can permit to be gratified by the sacrifice of a thing so sacred as human life.

[Payne v. The State.]

In the present case, as in Pritchett's, appellant sought his victim, following him from one place to another, until they met, and then accosted him with the challenging inquiry : "Do you want anything out of me this morning?" Soon after which, he fatally shot the deceased, at a time when the latter had no weapon drawn, nor any in fact, on his person. It was, in no legal sense, a case of self-defense ; and the able judge who presided at the trial correctly ruled, that testimony of threats, alleged to have been made by the deceased two weeks before, could not be submitted to the jury as evidence in favor of the defendant.—See, also, *Hughey v. The State*, 47 Ala. 97.

There was no error in the charge given to the jury, which was excepted to, or in refusing the charge that was asked on behalf of defendant, and refused. The latter was objectionable, in reciting a fact that was not proved ; and also because, without explanation, it would be apt to confuse, instead of aiding the jury.

4. But there was error in excluding the testimony offered to show that Hitchcock, a witness for the State, had given a different account of the circumstances of the killing of Smith by the defendant, when examined upon the application for bail, from that which he gave on the trial. Hitchcock's attention had been called, on cross-examination, to the difference between these two statements. He was asked if, on the former occasion, he did not testify, "that defendant got off his mule, and said, 'Come out in the road,' before defendant raised his gun ;" to which he replied, that "he did not remember whether he said so or not." On the trial, this witness testified, that defendant " said to the deceased, 'Do you want anything out of me this morning?' and raised his gun ;" and he represents deceased as having *afterwards gotten off his horse.*

The rulings, in such cases, have not been uniform. Phillipps, in his work on Evidence, says, that *Tindal*, C. J., in a case before him, "said he had never heard such evidence admitted in contradiction, except where the witness had *expressly denied the statement*, and he rejected the evidence ; and on another occasion, Lord Abinger, C. B., expressed a similar opinion. But Parke, B., in a case before him, held that contradictory statements of a witness could be introduced to impeach his evidence; though, in order to lay a foundation for them, and to enable the witness to explain them (and, as he conceived, for that purpose only), 'the witness must be asked whether he ever said what is suggested to him, with the name of the person to whom, or in whose presence he had said it, or some other circumstance sufficient

[Connelly v. The State.]

to designate the particular occasion. If the witness . . admits the conversation imputed to him, there is no necessity to give further evidence of it; but, if he says he does not recollect, that is not admission; and you may give in evidence, on the other side, to prove that the witness did say what was imputed, always supposing the statement to be relevant to the matter at issue."—2 Phillipps on Ev. (4th Am. ed., with Cowen & Hill's and Edwards' notes), 959–60. We agree with Mr. Phillipps, that the ruling of Baron Parke is the most sound and fittest to be followed. If the rule were otherwise, it might happen that, under the pretense of *not remembering*, a witness, who has made a false statement, and knows it to be false, would escape contradiction and exposure.

This particular question seems to have rarely come up in the American courts, whose decisions are reported. We find, however, that in Vermont the rule corresponds with that adopted by Baron Parke.—*Holbrook v. Holbrook*, 30 Vt. 433. In Massachusetts and Maine, contradictory statements of a witness are allowed, without any previous interrogation of him about them. In Alabama, he is first examined concerning them—only, however, to *prevent surprise, and afford him an opportunity for explanation.*—2 Brick. Dig. 548, §§ 117, 118. But, if the witness says he has no recollection of having made such contradictory statements, they may be proved.

For the error of not permitting this to be done, the judgment must be reversed, and the cause remanded. Let the prisoner remain in custody, until discharged by due course of law.

