## M. H. LEVY v. THE STATE.

*No. 3208.	Decided November 13.*

1. **Manslaughter—Evidence—Uncommunicated Threats**, as a general rule, are provable on a trial for murder when the evidence raises and leaves in doubt the question as to which of the parties to the fatal encounter began the attack. They may be also proved to corroborate evidence of communicated threats previously admitted. But manslaughter, being predicable only upon "adequate cause," and it being impossible for facts unknown to the defendant to enter into or become constituent elements or factors in creating "adequate cause," uncommunicated threats can have no weight in establishing it, or in mitigating its punishment. Wherefore, the conviction being for manslaughter, the accused can not be heard to complain of the ruling of the trial court rejecting proof of uncommunicated threats offered by him. Moreover, the language of the deceased sought to be proved as uncommunicated threats in this case partakes of the nature of vituperative and abusive language rather than threats, and besides was merely cumulative of other evidence of like character admitted on the trial.

2. **Same.**—The clothing worn by the deceased at the time of the homicide is competent evidence for the State. The coat introduced in evidence on this trial being fully identified as the coat worn by the deceased when shot by the defendant, it was no valid objection to the same as evidence that it had been worn by a negro since the homicide, and that the frock had been cut off, and patches sewed over the bullet holes in the breast and side.

3. **Same—Impeaching Testimony.**—It is no longer an open question that a witness who testifies that he has no recollection of having made contradictory statements imputed to him may be impeached by proof of such contradictory statements. See the opinion *in extenso* for a review of the authorities on the question.

4. **Manslaughter—"Adequate Cause"—Charge of the Court.**—It is objected to the charge of the court that instructing upon manslaughter it erroneously restricts "adequate cause" to insulting language used by the deceased toward a female relative of the defendant. *Hela,* that the objection is not tenable, in view of the evidence which shows conclusively that if manslaughter enters into case at all it rests solely upon insulting language used by the deceased about the defendant's mother.

5. **Same.**—To denounce a man as a "son-of-a-bitch" or a "damned son-of-a-bitch" does not amount to the "use of insulting language toward a female relative" of such man, withing the statutory meaning of the terms, and will not be adequate cause to reduce a killing to manslaughter.

6. **Same—Self-Defense—Threats—Charge of the Court.**—In connection with the main charge upon self-defense, the trial court instructed the jury as follows: "If defendant sought Joiner and brought on the difficulty with him and killed him, then in such case the defendant can not rely on self-defense, and can not avail himself of

threats made against his life." *Held*, sufficient under the proof on the trial. Nor did the trial court, in view of the evidence, err in refusing the special instructions requested by the defendant upon the law of self-defense. (For such special instructions see the opinion of the court.)

7. **Same.**—If the provocation upon which the defendant acted in killing the deceased was insulting language used by deceased about his mother, and the defendant sought the deceased with the intention of killing him therefor, it would make no difference, his own intention being to commit a felony, that the deceased attempted to draw a weapon, or that he shot to save his own life; he could not claim self-defense, but his act would constitute manslaughter, he having provoked the occasion which produced the necessity to kill the deceased.

APPEAL from the District Court of Robertson. Tried below before Hon. John N. Henderson.

The appellant was convicted of manslaughter under an indictment which charged him with the murder of J. M. Joiner, in Robertson County, Texas, on the third day of November, 1888. The penalty assessed by the verdict was a term of five years in the penitentiary.

The street in the town of Bremond on which the killing occurred runs north and south. Schmidt's saloon is situated on the east side of the street and faces west. Myatt's saloon is situated on the west side of the street and faces east, but is south of the point opposite Schmidt's saloon. The State's evidence comprehends the testimony of several witnesses, whose narratives of the occurrences immediately attending the homicide concur almost circumstantially.

According to all of these witnesses the deceased, when he was shot by the defendant, about 3 o'clock on the afternoon of November 3, 1888, was standing in the street, a few feet distant from the sidewalk, at the point immediately opposite the dividing wall between Myatt's saloon and the barber shop which adjoined it on the south. He was facing nearly west, and was engaged in conversation with John Myatt and a Mr. Davis. Defendant stepped out of Schmidt's saloon with a double barreled shot gun in his hands. He held the gun in an attitude to shoot, grasping the grip with his right hand, while his left, a little further up the barrels, held the muzzle slightly elevated. He stepped off the sidewalk, passed around a wagon, and advanced to a point at or near the middle of the street, about forty feet distant from deceased and Myatt and Davis. He then presented his gun and called to Myatt, "Get out of the way, John!" Myatt ran rapidly toward defendant, calling upon him not to shoot. Defendant, waving his gun to Myatt to stand aside, told him again to get away, and about the time that Myatt reached a point within eight or ten feet of him fired, and the deceased fell. Deceased discovered the defendant just before the shot was fired, and raised his right arm and partially stooped his body, as though attempting to escape the shot. Immediately after the shot was fired Myatt seized the defendant, and asked him, "Are

you crazy?" He replied, "I will kill any man who calls me a son-of-a-bitch! I am no son-of-a-bitch, and my mother is no bitch!"

One of the witnesses for the State testified that a feeling of bitter hostility existed between the defendant and the deceased for at least two months before the homicide. On cross-examination this witness stated that he met the defendant in the town of Bremond late in October, 1888, on which occasion the defendant remarked to him, "I understand that you are against Joiner for justice of the peace, and I am glad to hear it." He then told the witness that a short time before he met the deceased in the town of Bremond; that he saw deceased as he left either Hearne's store or the postoffice and started across the street; that he intercepted deceased, called upon him to stop, and then said to him, "I understand that you have been telling around that I am a cow-thief; if you have, you are a d——d lying son-of-a-bitch!" Deceased, according to the statement of the defendant to the witness, replied to defendant, "I have only been reporting what others have said," and walked off without resenting his, defendant's, denunciation. The State rested.

Dr. G. M. Stephens testified for the defense that he examined the body of deceased immediately after he was shot. In one of his pockets he found a Smith & Wesson five-shooting pistol, loaded all around. Deceased at the time of his death was justice of the peace of the Bremond precinct, and was running for re-election.

Silas Morehead testified for the defense that he was bartender at Schmidt's saloon at the time of the tragedy. Deceased was in and out of that saloon a great many times on that day, the books showing entries against him for 31 drinks. The last time he was in the saloon was about 15 minutes before the shooting. He was then considerably under the influence of whiskey, and was very angry. As he stepped up to the bar he remarked that he had just heard something that made him so mad he could not eat; that a certain party had boasted of cursing him a few days before. Turning to Tom Bates deceased said, "Tom, you know who I mean. It is Marshall Levy—a God damned cow-thieving son-of-a-bitch! I will fix him before night. If I don't, I want you or some other good friend of mine to kick my a—s out of Bremond. You know, Tom Bates, that he can't curse me to my face." Bates replied, "No, not without fighting." Deceased and Tom Bates then took a drink, the deceased continuing while in the saloon to denounce the defendant. Besides the witness, Tom Bates, L. C. McKinney, John Sumner, Mr. Lowry and others were in the saloon at the time referred to. Deceased had been cursing and denouncing defendant "promiscuously" for several days preceding the homicide, calling him a " cowardly son-of-a-bitch!" a " cow-thief!" a "ring-tailed leader of cow-thieves!" etc. A very few minutes after deceased left the saloon on the occasion above referred to, Walter Ditto and J. P. Darwin came into the saloon through the east door from

the horse trading ground in the rear of the saloon. According to general reputation the deceased was a man who would likely execute a threat. The witness met the defendant about an hour before the killing. He then told witness that he could not stand deceased's abuse, and was going home to avoid a difficulty; that "if he went home perhaps deceased would cool off. '

Bates, Sumner, and McKinney, testifying for the defense, substantially corroborated the witness Morehead as to the statements of deceased in Schmidt's barroom a few minutes before the killing, varying slightly as to the form of the epithets used by deceased. According to Sumner, he spoke of defendant as "that God damned lying, thieving son-of-a-bitch;" according to Bates, as "that God damned lying, cow-thieving son-of-a-bitch, Marshall Levy," and according to McKinney, as "that God damned mother-f—king, bastardly son-of-a-bitch!" Sumner testified that defendant, Ditto, and Darwin came into the saloon a few minutes after the deceased and Bates left, took a drink, and went to the rear of the saloon. Defendant called to McKinney, who joined him in the back part of the saloon. McKinney testified that when defendant came into the saloon after deceased and Bates left, he asked witness if he heard deceased make remarks about him. Witness replied that he did, but did not repeat the remarks, nor did deceased ask him what they were. According to Bates, deceased concluded his tirade against defendant in the barroom by declaring his intention "to fix the God damned thieving son-of-a-bitch before night, and I want some of his friends to go and tell him what I say." According to reputation, deceased was a man who was likely to execute a threat seriously made by him. Sumner, who arrested defendant after the shooting, asked him why he shot Joiner. Defendant replied that he could not stand what Joiner had said, and was saying about him.

G. W. Holland testified for the defense that he met deceased as he, deceased, came out of Schmidt's saloon just before the shooting. Deceased said to witness and Mr. Harrison, "I have just been in the saloon telling Morehead that a party has been telling damned lies on me. I made the remark to Morehead that the party is a God damned cow-thieving son-of-a-bitch. I meant Marshall Levy, and I cursed him where I know he will hear of it. Marshall Levy is a damned cow-thieving son-of-a-bitch, and if he has any friends, I would like for them to go and tell him what I say." Witness and Harrison begged deceased to stop the use of such language, as it might injure his chances of re-election. He replied that he was of such temperament that he could not help talking as he felt when he was mad. Witness did not see the fatal shot fired, but heard defendant immediately after the shooting exclaim, "I am no son-of-a-bitch; my mother is no bitch, and no man can call me so!"

Roe Slaughter testified for the defense that for five or six months preceding the killing the defendant's gun had been in his, witness's, store

exposed for sale. Just before the shooting the defendant, pale and excited, came hurriedly into the store and got his gun. It was loaded with buck shot, of which fact defendant was aware. Witness asked defendant what he was going to do with the gun. He replied that Joiner had been talking about him until he could stand it no longer, and that he was going to see him and make him take back what he had said. Witness said to him, "Don't do anything rash, Marshall." He made no reply, but went out with the gun; turned south, and soon afterwards the witness heard the shot.

Walter Ditto was the next witness for the defense. He testified, in substance, that he and J. P. Darwin met the deceased at the north door of Schmidt's saloon about twenty minutes before the shooting. Deceased asked Darwin how the election for justice of the peace was going out in the eastern part of the precinct. Darwin replied that the sentiment of the people was divided. Deceased replied, "Yes, I suppose so. Marshall Levy, the God damned cow-thieving bastardly son-of-a-bitch, is working against me in this election; and God damn the son-of-a-whore, I will kill him before night!" Witness and Darwin met the defendant at Schmidt's east door a few minutes later, when Darwin told defendant what deceased had said about him. The information had a very exciting effect upon defendant. His lips quivered, and he appeared to be on the verge of shedding tears, when he remarked, "I can't stand that." Witness, Darwin, and defendant then went to the bar and took a drink, after which witness and Darwin went to the next block down the street. Within a few minutes witness saw defendant coming down the street with a gun in his hands. He went in at the upper door of Schmidt's saloon, soon came out at the lower door, and started across the street toward Myatt's saloon, the muzzle of the gun pointing down. At that time deceased and Myatt were standing in the street, a few feet from Myatt's sidewalk, deceased facing north and Myatt south. As defendant walked toward them, deceased turned his head and saw defendant. He instantly threw his right hand to his hip pocket as if to draw a pistol. Defendant raised his gun and fired, and exclaimed, "I am no son-of-a-bitch, and my mother is no whore!" The witness did not think the defendant could have seen the deceased between the time Darwin told him of deceased's language and the shooting. Myatt started toward defendant just before the fatal shot was fired. Darwin testified for the defense circumstantially as did the witness Ditto.

A number of other defense witnesses testified to the use by deceased of intemperate and abusive language about defendant, and John Myatt testified that at the very time he was shot, or rather up to the moment he, the witness, left him to prevent defendant from shooting, the deceased was abusing the defendant to him, using about the same language he used in Schmidt's saloon.

The State introduced two witnesses in rebuttal, who testified that they were looking at deceased when he received the fatal shot. Deceased did not, just before receiving the shot, throw his right hand towards his hip pocket. On the contrary, he threw it up, and it was in an elevated position, holding his walking cane, when the fatal shot was fired.

The State recalled Walter Ditto, and asked him if he did not, about a week after the killing, tell Matt Oldham at the house of his, Matt Oldham's, mother, in the presence of Mrs. Oldham and her two other sons, that he, Ditto, did not see Levy shoot Joiner, and knew nothing about the killing; that he knew nothing about the case, and was glad of it, as he did not want to be a witness. The witness replied that he had no recollection of making any such statements to Matt Oldham. Matt Oldham was then introduced by the State, and testified that Ditto did make the statements thus imputed to him.

*Simmons & Crawford,* and *Clark, Dyer & Bolinger,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

White, Presiding Judge.—We have maturely considered, weighed, and determined every question raised in the voluminous record before us, and so ably submitted in the brief and oral argument of distinguished counsel for the appellant. Many of these questions will not be noticed further than to remark that under well settled rules and decisions they either fail to show any error whatsoever, or at most, none of them reversible error, in the rulings complained of. We only propose to discuss such matters as present the most serious issues in the case.

Defendant has been found guilty of manslaughter. Certain evidence with regard to uncommunicated threats was held inadmissible by the court. In our opinion the proposed excluded evidence, as set forth in the bills of exception, shows vituperative and abusive language about rather than threats of violence against the defendant. It could only be cumulative of the great amount of similar evidence which was freely admitted by the court. If the proposed evidence could be fairly construed as threats, still, being uncommunicated, they could not possibly have influenced the conduct of defendant, or had any bearing upon or afford any presumption as to his action in killing deceased, unless there had been a doubt as to which of the parties commenced the attack, in which case such uncommunicated threats would be admissible and proper evidence for the purpose of showing that, in all probability, the deceased made such attack, and his motive in doing so. Whart. Crim. Ev., 9 ed., sec. 757. Such evidence has also been held admissible to corroborate evidence of communicated threats previously admitted. Holler v. The State, 37 Ind., 57; Cornelius v. The Comm., 15 B. Mon., (Ky.)

539; Horr. & Thomp. Self-Def., 568, 569. But such evidence could possibly have no weight in establishing manslaughter or in mitigating its punishment, because manslaughter is predicable only upon "adequate cause," and facts unknown to defendant can not enter into and become constituent elements or factors in creating "adequate cause." But as stated above, the proposed evidence, as it is set forth, can not by any fair construction of language be denominated threats, or indeed, anything more than vulgar and abusive epithets; and such being their character, they were properly excluded because uncommunicated, and affording no light as to the homicide. There was any amount of such evidence admitted.

Clothing worn by deceased at the time he was shot was permitted to be produced in evidence before the jury. Such evidence was admissible and proper. King v. The State, 13 Texas Ct. App., 277; Hart v. The State, 15 Texas Ct. App., 202, and authorities cited. See also 75 Ala., 14; 65 Ga., 508; 61 Cal., 391; 121 Mass., 69; 90 Ind., 320; 99 Ind., 413; 8 Crim. Law Mag., 640. Deceased's coat was identified beyond question as the one worn by him on the fatal occasion. It had been given to a negro, who had worn it since it had come into his possession, and he had cut off the skirt of the coat and his wife had sewed patches over the bullet holes in the side and breast. There was not the slightest evidence, however, that there had been any illegal or unwarranted tampering with said coat, nor is there any pretence that it did not show the character and location of the bullet holes just as they appeared upon it the day of the homicide.

When defendant's witness Ditto was upon the stand the prosecution, for the purpose of laying a predicate to contradict his testimony, asked him on cross-examination, fixing time, place, and parties, if he did not tell Matt Oldham that he did not see the killing of Joiner by Levy, and that he knew nothing about it. To which the witness replied that he "did not remember whether he did or not." And again, fixing time, place, and parties, the witness was asked if he did not tell Matt Oldham that he did not see Levy shoot Joiner, and did not know anything about the killing, and was glad of it, as he did not wish to be a witness in the case. To which the witness replied that he "does not remember telling Matt Oldham any such thing." Matt Oldham was called by the State to prove that the above statements were made by said witness Ditto. Defendant objected to such contradictory evidence, upon the ground that it is only upon a denial, direct or qualified, by the witness that he had made such statements that proof of his having done so was authorized and allowable. The court overruled the objection, and permitted the contradictory statements to be proved. This was not error. In Walker's case, 17 Texas Ct. App., 16, it was held that "when a witness denies or fails to remember that on former occasions he made statements inconsistent with his testimony on the trial, evidence that he did make such

statements is admissible upon the establishment of a proper and sufficient predicate."

Upon the admissibility of this character of evidence the Supreme Court of Alabama say: "The rulings in such cases have not been uniform. Phillips in his work on Evidence says that Tindal, C. J., in a case before him, 'said he had never heard such evidence admitted in contradiction, except where the witness *had expressly denied the statement*,' and he rejected the evidence; and on another occasion Lord Abinger, C. B., expressed a similar opinion. But Parke, B., in a case before him held that contradictory statements of a witness could be introduced to impeach his evidence, though in order to lay a foundation for them, and to enable the witness to explain them, 'a proper predicate must be laid. If the witness admits the conversation imputed to him there is no necessity to give further evidence of it, but if he says he does not recollect, that is not admission, and you may give in evidence on the other side to prove that the witness did say what was imputed, always supposing the statement to be relevant to the matter at issue.'" 2 Phil. on Ev., 4 Am. ed., with Cowen & Hill's and Edwards' notes, 959, 960.

We agree with Mr. Phillips that the ruling of Baron Parke is the most sound and fittest to be followed. If the rule were otherwise is might happen that under the pretense of *not remembering* a witness who has made a false statement and knows it to be false would escape contradiction and exposure. This particular question seems rarely to have come up in American courts whose decisions are reported. We find, however, that in Vermont the rule corresponds with that adopted by Baron Parke. Holbrook v. Holbrook, 30 Vt., 433. "If the witness says he has no recollection of having made such contradictory statements they may be proved." Payne v. The State, 60 Ala., 80. See also Williams v. The State, 24 Texas Ct. App., 637.

The only other matters we propose to discuss are the complaints that have been urged to the charge of the court as given, and the refusal of certain requested instructions propounded in behalf of the defendant.

It is urgently insisted that the charge upon manslaughter was erroneous in that it restricted "adequate cause" alone to insulting language used by the deceased towards or about the defendant's mother. Defendant has been found guilty of manslaughter, and in our opinion if manslaughter be in the case made by the fasts, it rests solely upon the insulting language of deceased about or towards the defendant's mother. Defendant's language used at the instant after he fired the fatal shot, as testified to by his witnesses Ditto and Darwin, "I am no son-of-a-bitch, and my mother is no whore," most clearly indicates his motive in and the cause which impelled him to commit the homicide. Some of the State's witnesses also say that Levy remarked, "I am no son-of-a-bitch;" "he can't call me a d—d son-of-a-bitch." If these latter were either of them the cause

of the killing, then to use such expression about another would not come within the legal meaning of our statutory terms "insulting words toward a female relative," and would not be adequate cause to reduce a killing to manslaughter. Simmons v. The State, 23 Texas Ct. App., 653; Willson's Crim. Stats., sec. 1022.

It is objected that the sixteenth paragraph of the court's charge is not sufficiently full. The court's instruction was, "if defendant sought Joiner and brought on the difficulty with him and killed him, then in such case the defendant can not rely on self-defense, and can not avail himself of threats made against his life." It is insisted that this instruction is incomplete in that it should have been further supplemented by the additional converse proposition, that "if defendant sought Joiner, not for the purpose of provoking a difficulty with him, but to ask him to refrain from further talking of and about him, or to retract some abusive language he had used towards defendant, or for any other innocent purpose, and that Joiner, before any act done or word spoken by defendant, made a hostile demonstration as if to draw a weapon and defendant then killed him, that then defendant's right of self-defense would not be impaired or lost." And upon the same subject it is claimed for error that the court refused defendant's second requested instruction to the effect: "That if defendant, after being informed of the vile and opprobrious epithets and language used by deceased towards him, and of the serious threats to take his life, armed himself with a shot gun and sought an interview with deceased, not for the purpose of provoking a difficulty with deceased and doing him serious bodily harm, or taking his life, and that he only carried the gun for his own protection, and that as soon as Joiner saw him (defendant) he made an hostile demonstration as if to draw a weapon, and defendant thereupon shot and killed him in his own necessary self-defense, you will find defendant not guilty." In our opinion the evidence did not call for or warrant these additional instructions. They announce sound principles if they were only applicable to the facts.

We have seen that from the language used by defendant the instant after the killing, the only inference deducible is that he killed deceased because of his insulting language concerning his mother. If that was the provocation, and he sought the occasion with the intention to avenge the insult by killing deceased, then it matters not, his own intention being to commit a felony, whether deceased attempted to draw a weapon or not, or whether he shot to save himself from being killed, the defendant could not claim self-defense in such state of case, but his crime would be in either event manslaughter, he having provoked the occasion which produced the necessity to take the life of deceased.

Did he seek deceased with the innocent intention of inducing or persuading him to retract his abusive language, and did he carry his double-barreled shot gun loaded with deadly buck shot as a means of persuasion

or of protection? Deceased had sent him not only most abusive and insulting messages, but had also said that he intended to kill defendant. before night. Defendant knew his desperate character, and that he was. a man likely to execute his threats. He not only had received these messages, but it is further shown in the testimony that just after he was informed of them he was in such proximity to the deceased that he must. have heard in person the additional revilings and denunciations which the enraged man, doubly infuriated by his drunkenness, continued to breathe forth unceasingly. He can stand it no longer He goes off some distance; gets his trusty shot gun, already loaded; comes back; sees his. deadly enemy across the street, and advances towards him with his gun. ready to present. The party conversing with deceased sees him, and starts to intercept, and begs him not to shoot. Defendant waves him away and tells him to stand aside, and without one word to deceased fires upon him. If his intentions were peaceable and his mission an innocent one, why not apprise deceased of it? Especially so when, if it be true, he saw that deceased, mistaking his motives and purposes, was apparently preparing to draw a deadly weapon upon him.

Under these circumstances can there be the slightest doubt that defendant intentionally provoked the occasion which produced the killing? If so, there can be no self-defense in his case. A person can not avail himself of a necessity which he has knowingly and wilfully brought upon himself. Willson's Crim. Stats., sec. 981; Thumm v. The State, 24 Texas Ct. App., 667; Allen v. The State, Id., 216.

Our conclusion upon the whole case is that the law has been fairly and. justly administered on the trial in the court below, and no reversible error having been made to appear on the record before us, the judgment. is affirmed.

*Affirmed.*

Judges all present and concurring.