State of Iowa, Appellee, v. James Blee, Appellant.

**Murder:** SELF-DEFENSE: EVIDENCE. On a prosecution for murder, where the killing is admitted and self-defense is relied upon in justification, the previous relation of the parties may be inquired into as bearing upon the question of who was the aggressor in the fatal affray, and the mental attitude of the defendant when he committed the act; but this rule does not permit an inquiry into the specific details of a previous affray.

**Examination of witnesses:** DISCRETION. On a criminal prosecution the extent of the cross-examination of a witness relating to

a conference with the witness is a matter within the discretion of the trial court.

**Evidence of conversations.** The testimony of a witness who cannot identify any of the language used by either of the parties to a claimed conversation should be stricken out.

**Hearsay evidence.** Evidence of what was said and done by a relative after the murder was inadmissible, where the relative was not a witness.

**Evidence:** SELF-DEFENSE. Under a plea of self-defense in the commission of a murder evidence tending to show that defendant acted in defense his property rights is immaterial.

**Evidence:** UNCOMMUNICATED THREATS. On a prosecution for murder where the evidence of self-defense raises a doubt as to who was the aggressor, uncommunicated threats made by decedent against defendant may be proven, not only to aid in determining who began the fatal affray but to corroborate the evidence of uncommunicated threats, and to show the attitude of decedent toward defendant.

*Appeal from Marion District Court.*— HON. J. H. APPLE-
GATE, Judge.

WEDNESDAY, MARCH 13, 1907.

THE defendant was indicted for murder in the first degree. On trial he was convicted of manslaughter, and he appeals.— *Reversed* and *remanded.*

*Hays & Amos,* for appellant.

*Chas. W. Mullen,* Attorney General, and *Lawrence De Graff,* Assistant Attorney General, for the State.

BISHOP, J.— The killing by defendant of his half-brother, Isaac Failor, is not disputed. Self-defense was relied upon to secure a verdict of acquittal. The parties resided upon adjoining farms; the defendant, with his wife, whom he had married about a year previous, living with his mother. It seems that trouble arose soon after the marriage of defendant, and was connected in some way with the right or supposed right of defendant to longer remain at the moth-

er's home. This was followed by a contention as to the right of defendant to a passageway over a portion of the farm of the deceased as a means of access to a remote part of the mother's farm. On the day of the tragedy, the defendant had been to such remote field — to salt some stock and to hunt, as he says — and on his return he traveled over the disputed way to reach a lane leading to the highway. As he passed by the outbuildings of deceased, carrying his shotgun, the latter with his young son twelve years of age were about the yards and buildings at work, and each saw the other. The immediate circumstances of the tragedy are in dispute. They were known only to the defendant, and the young boy, as the shooting of Failor was instantly fatal. It is the story of the boy as told on the witness stand that, after defendant reached a gate leading into the lane, " he called my father down. I walked along down that way with my father, and then he asked him what he had set that post in that gate for. Father said: ' Because I wanted to.' Jim said: ' You set it there to keep me from going through, didn't you ? ' Father said: ' You are not going through there tracking up my land.' Jim said: ' If you stop me from going over through here, I will stop you from going over that lane.' Father said: ' I have paid for that lane, and I have a right to travel it.' Jim said: ' Ike, I have got a contract to go through here.' Father said: ' I never gave you a contract in my life.' Jim said: ' Don't you say that again, that you are going over that road.' Father said: ' I will.' Jim then took the gun off his shoulder and pointed it at him, and said: ' Don't you say it again that you are going through there.' Father said: ' I will.' Then father said: ' God bless my children.' And then Jim shot." The boy further says that, when the shot was fired, his father's hands were hanging at his side, and that he had a pair of cloth mittens on. It is the defendant's version that, as he approached the gate, the deceased called to him " and wanted to know what in hell I was doing in there.

He was, perhaps, 125 feet behind me, and the little boy still behind him. I asked him if I didn't have a right to go through there, and he said: 'No, God damn you, you haven't.' And I asked him who set that post down there, and he said: 'By God, I set it there.' And he kept coming on, and I stopped, and he kept coming after me, and he used an oath and told me to get out of there or he would fix me, and I went on toward the gate. When I got over the gate, he was within 16 or 18 feet of me. He had then pulled off his mitten, and he says: 'God damn you, I will kill you'—and reached back for his revolver. I was standing right in front of him, and when he reached back for his revolver I shot him."

I. The defendant, as a witness, testified that, on an occasion a short time before the tragedy, he met the two brothers, Isaac and William Failor, when an altercation of words and blows took place. "I had been to a neighbor's, and when I came back I saw Ike at a small brush pile just west of our house. It was dark the first part of the evening, but in the latter part it commenced to snow and got lighter. This was probably a hundred feet from the house. The first I noticed he stepped out in front of me." Being asked what was said and done by Isaac, the state objected, on the ground that a recitation of the details of the affray was not competent, and the objection was sustained. Counsel for defendant then stated it to be their purpose to show as circumstances of the meeting that the affray began by Isaac cursing the defendant, and by at once following this up with a physical assault. To this the court responded by saying, in substance, that the fact of the altercation was alone material, not the particulars or merits thereof, "or even to show who was the aggressor, or the circumstances surrounding it." This ruling was subsequently modified to permit the introduction of "any matter in connection with it in the nature of a threat against the defendant." It is no part

1. MURDER: self-
defense: evi-
dence.

of the contention for error that defendant was entitled to
go into the specific details or merits of the affray. The
complaint is that he was not allowed to show generally who
was the aggressor. We think the contention for error thus
made should be sustained. It is quite universal doctrine
that, in cases of homicide, where the killing is admitted and
self-defense is relied upon as a justification, the state of the
previous relations between the parties may be inquired into,
and this for two purposes: as bearing upon the question who
was the aggressor in the fatal affray, and as tending to throw
light upon the mental attitude of the defendant when he
fired the fatal shot. And to the state of the law as thus far
stated, counsel for the state and defendant are agreed.

Addressing ourselves to the phase of the subject first
above stated, it must be manifest that it was a matter of
prime importance to determine who was the aggressor in
the fatal affray. But two witnesses could speak from per-
sonal knowledge on the subject, and in their testimony they
were diametrically opposed to each other. If the boy was
to be believed, the killing was unjustifiable. If the de-
fendant was to be believed, he might well be acquitted; his
asserted belief of imminent peril being credited. Now, the
mere fact that previously a state of enmity had existed be-
tween the parties, or that they had been more or less fre-
quently involved in affrays, without more, could not in the
very nature of things have effect to throw light upon the
controverted fact as thus made in the case. The fact of
the occurrence of an affray takes on importance only when
it is known who was the aggressor therein. The parties
might have mutually agreed to fight, or, on the other hand,
one of the participants may have been wholly innocent of
offense. To bring forward the bare fact that an affray had
taken place, cutting off all inquiry into the attitude of the
participants at the outset might well result in a perversion
of the course of justice, and therefore altogether indefensible.
It is the fact of an assault, and not the mere fact of an

affray, that is material.   And, it being known who made the
assault, the effect, as we think, is to lend corroboration to the
claim that the one making the assault was also the aggressor
in the fatal affray.   It is clearly within the bounds of reason
to say that the claim by one party to an affray that in re-
spect thereof the initiative was taken by the other may be
strengthened by proof of the fact that such other had on
former occasions threatened to, or had in fact assaulted or
attacked, beat, waylaid, or shot at him — this, of course,
where, as in the case before us, there had been no inter-
mediate reconciliation.   Stating the proposition in another
way, where one is shown to have committed an unprovoked
assault on yesterday, it is not altogether improbable that he
will repeat it to-day or to-morrow, if the occasion shall bring
the object of his wrath within his reach, and the fire of
passion is still burning.   Of course, the corroborative
weight to be given the evidence of a previous assault or
threat to assault is matter for the consideration of the
jury.   As directly supporting our conclusion thus expressed,
see 21 Cyc. 962, citing the following, among other, cases:
*Bell v. State,* 69 Ark. 188 (61 S. W. 918, 86 Am. St. Rep.
188) ; *Monroe v. State,* 5 Ga. 85 ; *Coxwell v. State,* 66 Ga.
309 ; *State v. Scott,* 24 Kan. 68 ; *Gunter v. State,* 111 Ala.
23 (20 South. 632, 56 Am. St. Rep. 17) ; *State v. Schleagel,*
50 Kan. 325 (31 Pac. 1105) ; *Glennewinkel v. State* (Tex.
Cr. App.) 61 S. W. 123 ; *State v. Graham,* 61 Iowa, 608.
See, also, *State v. Helm,* 92 Iowa, 540, wherein it is said
that, if it be uncertain who was the aggressor, even threats
by the deceased which had never been communicated to his
slayer are admissible as tending to show that in the fatal
encounter the deceased was seeking to carry his threats into
execution.

The Attorney General brings to our attention many
cases — and we need not cite them — holding that the de-
tails or merits of the previous affray cannot be inquired into.
We have no need to dispute the authority of such cases, even

if we were so disposed, which we are not. It could serve no useful purpose to know how an affray, once started, was waged from beginning to end, or, in respect of the subject matter lying back, and which brought on the quarrel, which one of the contending parties was in the right, and which one in the wrong. As already stated, it is the fact of the assault, and who made it, that is material. By what it was followed, or how it terminated, and whether prompted by a real or fancied grievance, are matters altogether beside the subject of present inquiry. We do not understand the cases relied upon by the state to go farther than to hold that evidence addressed to such matters of detail or merits is inadmissible.

Going, now, to the remaining phase of the subject in hand, we think the question who made the previous assault was material to be considered in determining what was the mental attitude of defendant at the time he fired the fatal shot. Certainly, proof of a previous threat by the deceased to assault defendant would tend " to throw light upon defendant's motive, and show whether in killing deceased he was actuated by malice, or acted in the belief that it was necessary for him to take the life of the deceased in order to preserve his own life." 21 Cyc. 963. And we perceive no good reason for denying to the fact of an assault actually committed evidential value to the same end; it being conceded that the state of enmity continued. The one is a verbal act of hostility, and the other a physical act of hostility. As far as either tends to make clear the attitude of defendant, and to show that he had cause to fear the result of a farther hostile demonstration on the part of the deceased, it is competent.

II. Complaint is made of numerous other rulings made by the court in the course of the introduction of the

2. EXAMINATION   evidence. We shall notice only those that
OF WITNESSES:
discretion.     have some appearance of merit, and are likely
to arise upon a further trial of the case. On cross-ex-

amination of Frank Failor, the young son of the deceased, he stated that a meeting of the Failor family was held before the trial at which one of the attorneys for the state was present. He was then interrogated in regard to what was said by different ones as to what their testimony would be. After proceeding to some length, the state objected, and the court ruled that the subject had been gone into far enough. The matter was in the discretion of the court, and there was no error.

One Welshons, a witness for defendant, testified to a conversation between himself and the two brothers, Isaac and William Failor; that therein the brothers were discuss-

**3. EVIDENCE OF CONVERSATIONS.** ing the matter of their enmity towards defendant and giving expression to threats against him. On cross-examination the witness answered that he could not tell what was said by Isaac, and what was said by William, and, on motion of the state, the evidence was stricken out as a whole. In this there was no error. The obvious purpose in calling the witness was to prove threats made by Isaac Failor, and, if the witness could not identify any language as having been spoken by him, the whole was incompetent.

It was made to appear that William Failor, brother of the deceased, was on the ground almost immediately after the shooting. One Bowers also came after the body had

**4. HEARSAY EVIDENCE.** been removed to the house. William gave Bowers a revolver, which the latter kept for a few hours, and then returned it to William. Defendant called Bowers as a witness, and sought to show by him what was said by William on such occasions. The evidence was refused as hearsay, and properly so. As far as appears, William had not been a witness, and there had been no evidence that a revolver was found on the person of the deceased.

Defendant sought to go into the question of the merits of the property differences existing between himself and the

deceased. The refusal on the part of the court to permit
this was not error. Simply stated, the situa-
tion was that defendant was accused by the
deceased of being a trespasser. Whether he was such or not
could not in any sense have been material to the case. There
is no pretense that he acted in defense of his possession. It
is his claim that he shot in defense of his person, and, in
making out this defense, it was not necessary to prosecute
any inquiry into the contract or property rights of the
parties.

5. Evidence:
self-defense.

III. Evidence tending to show threats made by the
deceased against the defendant was admitted in evidence.
Some of such threats were confessedly not communicated to
the defendant prior to the homicide. The
court instructed the jury that uncommuni-
cated threats could be considered for no purpose save as an
aid in determining who was the aggressor in the fatal en-
counter. This instruction is denounced by counsel for ap-
pellant as error; and it is the argument that the uncom-
municated threats had bearing, not only to show who began
the affray, but to corroborate the evidence of communicated
threats, and also to show the attitude of the deceased to-
ward defendant. The precise question is now before
this court for the first time. However, it has arisen and
been passed upon by the courts of sister States with more
or less frequency, and almost without exception, as far as
we have been able to discover the rule as here contended for
by appellant has been adopted. In *Levy v. State,* 28 Tex.
App. 203 (12 S. W. 596, 19 Am. St. Rep. 826), it is said:
" Such uncommunicated threats would be admissible and
proper evidence for the purpose of showing that in all
probability the deceased made such attack, and his motive
in so doing. Such evidence has also been held admissible
to corroborate evidence of communicated threats previously
admitted "— citing *Holler v. State,* 37 Ind. 57 (10 Am.
Rep. 74); *Cornelius v. Com.,* 15 B. Mon. (Ky.) 539;

6. Evidence: un-
· communicated
threats.

Horrigan & Thompson on Self-Defense. In Cornelius v. Com. it was said: " We think that this testimony should, under the circumstances in this case, have been admitted. It tended to confirm the other evidence that Hopson had made threats against the prisoner, and to counteract a presumption of fabrication by the witnesses who gave their testimony. Besides, Hopson's intention to make an attack on the accused was an important matter, as well as the belief of the existence of such an intention on the part of the prisoner." And this rule was expressly approved in Holler v. State. In *State v. Williams,* 40 La. Ann. 168 (3 South. 629), it was said: " We think that reason and authority concur in establishing their [uncommunicated threats] admissibility, under the circumstances, as corroborating the evidence as to the uncommunicated threats, as indicating their meaning and seriousness, as establishing the purpose with which the deceased provoked the encounter, and throwing light upon his acts in connection therewith." In *State v. Turpin,* 77 N. C. 473 (24 Am. St. 455), it was said: " This evidence [uncommunicated threats] was competent, and should have been admitted for several reasons: First, the uncommunicated threats were admissible for the purpose of corroborating the evidence of the threats which had already been given; second, they were admissible to show the state of feeling of the deceased toward the prisoner; third, for ascertaining who began the affray." In *State v. Brown,* 22 Kan. 230, in speaking of uncommunicated threats, the court said: " Again, a rejection of these threats was error, as evidence of communicated threats had already been admitted, and in such cases it is competent, for the purpose of corroborating this testimony, to introduce evidence of uncommunicated threats " — citing authorities. In *Roberts v. State,* 68 Ala. 156, in speaking of uncommunicated threats in cases where self-defense is relied upon, it was said that such threats " recently made, are admissible for the purpose of showing the *quo animo* of such demonstration or attack.

So uncommunicated threats are frequently admitted for the purpose of corroborating those that are communicated and which have already been admitted; and, likewise, where it is doubtful from the testimony which party commenced the affray, threats of this character are admissible as in the nature of facts to show who was properly the assailant." In *Territory v. Hall*. 10 N. M. 545 (62 Pac. 1083), this question received very thorough consideration at the hands of the court, and the following conclusions were announced: " There are a few cases which hold that uncommunicated threats, to be admissible for any cause, must be shown to have been communicated to the accused, and others which hold that uncommunicated threats are not admissible, unless they constitute a part of the *res gestæ;* but the more modern and better reasoned cases favor the admission of such evidence in the following instances: (a) To show who began the affray; (b) to corroborate evidence of communicated threats; and (c) to show the attitude of the deceased." To our minds each of the cases thus cited is exactly in point, and we think the rule therein announced should be adopted for this State. From this it follows that the instruction complained of must be condemned.

But a word will be required to dispose of the further contention of appellant that the instruction we have just been considering was erroneous, in that it excluded the uncommunicated threats from consideration as evidence bearing on the attitude of the deceased. This criticism is without merit. The question of the attitude of the deceased was bound up in the question whether or not he was the aggressor. And, as an aid to reaching a conclusion on that question, the instruction authorized consideration of the threats.

For the errors pointed out in this opinion, the defendant must be awarded a new trial, and the case will be remanded for that purpose.— *Reversed.*