## I. T. GARNER, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. An exception to a ruling denying a motion for a continuance is not waived by not making the ruling a ground of motion for a new trial.

2. A motion for a continuance rests in the sound discretion of the trial court. Where a motion of this character—this one being on the ground that the counsel of the accused was too sick to conduct the defense properly—has been refused, and it does

8

| 28 | 113 |
| 28 | 546 |

| 28 | 113 |
| 29 | 383 |
| 29 | 546 |

| 28 | 113 |
| 30 | 77 |
| 30 | 169 |
| 30 | 242 |
| 31 | 171 |
| 31 | 231 |
| 31 | 282 |
| 31 | 523 |

| 28 | 113 |
| 32 | 247 |
| 32 | 497 |

| 28 | 113 |
| 34 | 179 |

| 28 | 113 |
| 33 | 299 |
| 33 | 350 |

| 28 | 113 |
| 37 | 386 |

| 28 | 113 |
| 38 | 41 |

| 28 | 113 |
| 40 | 185 |
| 40 | 263 |
| 40 | 498 |
| 40 | 521 |

| 28 | 113 |
| 41 | 323 |

not appear that there was an abuse of a sound discretion in refusing it, the appellate court will not interfere.

3. When the admissibility of threats is dependent upon the commission of an overt act by the deceased, there must be some evidence of the overt act; or, in other words, there must be evidence which at least tends to show that the deceased had, at the time of the killing, in fact or apparently sought a conflict with the accused, or was actually or apparently making some demonstration of attack towards the accomplishment of his threats, or some demonstration reasonably calculated to induce the belief that the execution of the threatened attack had actually commenced. There must be at least apparently such a demonstration of an intention to execute immediately the threats as will naturally induce a reasonable belief that the party threatened will lose his life or suffer serious bodily harm if he does not immediately take the life of his adversary.

4. Threats admissible in connection with an overt act are so admissible because they serve to explain the demonstration or overt act and to show the reasonableness of the accused in believing himself to be in that danger which justifies the taking of human life in self defense.

5. The question of admissibility of evidence of threats is one for the court's decision. If there is the slightest evidence tending to prove a hostile demonstration which may reasonably be regarded as placing the accused apparently in imminent danger of losing his life or sustaining great bodily harm, evidence of the threats should be admitted. It should be admitted also where the mind of the court is in a state of doubt whether or not the alleged demonstration, considered in connection with the threats, would be sufficient to cause a person of ordinary prudence to reasonably believe himself to be in danger of life or great bodily harm. They should not be excluded except where there is no evidence tending to prove a hostile demonstration of the character indicated above.

6. The weight of evidence of threats, considered in connection with that as to the overt act, is like that as to the credibility of the witnesses testifying as to such act or threats, a question for the jury. It is for the jury, after considering all the testimony relating to the circumstances of the homicide, to decide whether or not there was reasonable ground for a person of ordinary prudence to believe himself to be in imminent danger of losing his life or of sustaining great bodily harm at the hands of the deceased if he did not kill him.

7. Evidence of the violent and dangerous character of the deceased is admissible to show, or as tending to show, that a defendant has acted in self-defense; or, in other words, under such circumstances as would naturally cause a man of ordinary reason to believe himself to be at the time of the killing, in imminent danger of losing his life, or of suffering great bodily harm, at the hands of the deceased; but such evidence is not admissible for this purpose except when it explains, or will give meaning, significance or point, to the conduct of the diseased at the time of the killing, or will tend to do so; and such conduct of the deceased at the time of the killing, which it is proposed to thus explain, must be shown before the auxiliary evidence of such character can be introduced. There must be evidence of some demonstration on the part of the accused, which, though considered independent of the dangerous character of the deceased it would be regarded as innocent or harmless, when received and considered in connection with or illustrated by such character may arouse a reasonable belief of imminent peril of the kind mentioned.

8. Where there is no evidence tending to show that the killing was in self-defense, or tending to show conduct upon the part of the deceased from which, even assuming that he was a violent and dangerous man, any inference can be reasonably drawn that he intended the immediate perpetration of an act imminently dangerous to the life of the accused, or of serious bodily harm

to him, evidence of violent and dangerous character of the deceased is inadmissible. In such cases there is no conduct to be illustrated or explained by a violent and dangerous character. If, however, there is evidence of any demonstration upon the part of the deceased at the killing, which his dangerous character would reasonably and naturally aid, explain or give point or significance to as tending to make out a case of self-defense on the part of the accused, evidence of such character should be admitted. Its admissibility is not confined to cases in which there is doubt of the guilt of the accused, or of the degree of the homicide, or that the killing was in self-defense.

9. The question of the admissibility of evidence of a violent and dangerous character is for the court to decide. The weight of such evidence, when admitted, is a matter for the consideration of the jury, in connection with all the testimony as to the homicide.

10. The fact that there is testimony in conflict with that tending to show an overt act is not ground for excluding evidence of threats or of violent and dangerous character.

11. Proof of the violent and dangerous character of the deceased is to be made by evidence of the deceased's general reputation in the community for such character, and not by specific acts or general bad conduct.

12. If the record in a criminal cause purports to recite the oath as it was in fact administered to the jury, and such oath appears to be substantially different from that prescribed by law. it seems that a reversal will result; on the contrary, however, if the record does not so purport, but merely imports that the jurors were in fact sworn, without anything negativing the presumption that they were duly sworn, the entry is sufficient; and it is a better form of entry than one reciting the oath, however accurately.

13. A record entry in a capital case which, after showing that the

prisoner was arraigned and pleaded not guilty, states : " Whereupon came the following jurors " (naming them) " who were duly selected, chosen, empaneled and sworn to try the issue joined," cannot properly be construed as purporting or having been intended to recite the oath prescribed by the statute for petit jurors in capital causes—which oath is as follows : "You shall well and truly try, and true deliverance make, between the State of Florida and the prisoner at the bar, whom you shall have in charge. So help you God,"—but should be construed as merely importing and intended to show that the jurors were in fact sworn properly, or that the above oath was administered to them.

14. Remarks made by the judge, in the course of a trial, as to the credibility of witnesses or the weight of relevant evidence, however inadvertently such remarks may be made, are the subject of exception and of assignment as error by the party to whom they may seem to be prejudicial, and are grounds for reversing a judgment. The policy of our jurisprudence is, that the jury shall decide all such questions, entirely liberated from the influence of the impressions of the judge as to them.

15. Voluntary intoxication, even though the immediate effect of it is to render the person unconscious for the time of what he is doing or temporarily insane, as distinguished from a fixed or settled frenzy or insanity either permanent or intermittent resulting from such intoxication, does not excuse a homicide or any act which in the absence of such intoxication and unconsciousness or temporary insanity, the immediate effect of such intoxication, would be criminal. This is the general rule applicable wherever the voluntary doing of the wrongful act constitutes the crime or a particular or specific intent is not an essential or constituent element of the offense, and in all such cases a person who is at the time of the commission of the act unconscious or insane as the immediate consequence of volun-

tary intoxication is liable in the same manner and to the same degree that he would be if sober.

16. In cases of which a specific or particular intent is an essential or constituent element of the offense, intoxication, though voluntary, becomes a matter for consideration or is relevant evidence, with reference to the ability of the accused to form or entertain such intent. Where a person is too intoxicated to entertain or be capable of forming an essential particular intent, such intent cannot exist and consequently the offense of which it is a necessary element cannot be perpetrated.

17. Where a premeditated design to effect the death of the person killed, or some human being, is essential to the offense of murder in the first degree, as it is in this State, intoxication, though voluntary, is relative evidence to be considered by the jury as to its effect upon the ability of the accused at the time of the killing to form or entertain such a design. If the jury find from the evidence that the accused was so much intoxicated as to be incapable of forming such a design, and yet that but for such incapacity he would be guilty of muder in the first degree, they cannot find him guilty of murder in that degree because such design is an essential element of murder in the first degree. Such intoxication and effect thereof will not render anything a sufficient provocation to reduce a killing to manslaughter that would not be such in the mere absence of such intoxication and effect; on the contrary, as between murder in any degree below the first and manslaughter, such intoxication plays no part. The only purpose for which it is admissible is to show an absence of a premeditated design to kill, or that the killing was not murder in the first degree, and the only effect of proof of intoxication rendering the accused incapable of forming or entertaining such design will be to reduce the killing to murder of the second or third degree according to the circumstances.

I. T. Garner v. The State of Florida.—Syllabus.

18. If one who intends to kill another becomes voluntarily intoxicated for the purpose of carrying out the intention, the intoxication will have no effect upon the act and intent thus carried out.

19. Where in a trial for murder in the first degree it is proper to charge upon the question of intoxication of the accused, the judge should instruct the jury as to the effect of intoxication to a degree sufficient to render him incapable of forming a pre-meditated design to kill.

20. It is improper to charge a jury that the law presumes that a person who is sober enough to form the intention to shoot another, and actually does kill him without justification or excuse, is sober enough to form a premeditated design to kill the person shot, and that in such case the person shooting is criminally liable for his act.

21. A charge whose effect would be to exclude from the consideration of the jury material circumstances of the killing shown by the testimony, is erroneous and properly refused.

22. In charging upon the right of self-defense the court should so instruct the jury as to preserve to the accused the benefit of a reasonable fear of great bodily harm as well as of death from the deceased.

23. If a judge instructs the jury as to a majority of them recommending to the mercy of the court a person convicted of a capital offense, the function will be best performed by simply giving the terms of the act to the jury, and informing them that the making or withholding the recommendation is a matter which the law has placed entirely within the discretion of a majority of them.

Writ of Error to the Circuit Court for Suwannee county.

STATEMENT.

The testimony as to the circumstances of the homicide is substantially as follows:

According to the State's witnesses, Lasley, the deceased, and four others were in a room at Branford, at night, in September, 1890, and Lasley and two of them had been talking, when, as Tyson says, the defendant came in, "either out of a back room, or somewhere," and picked up a lantern and jerked it up and down, and about that time as the proprietors were about to close up, he picked up a glass and threw it and said "God damn it, let her go," and threw the glass; or, as another State witness, Painter, says, the defendant took a lantern and commenced throwing it around, and on being spoken to by one of the proprietors, put it down and then took a bottle out of his pocket and sat it down hard on the counter, and then "took up a glass as though he thought there might be something in the bottle, and sat the glass down very heavy;" this witness saying he does not "know what became of it, perhaps it went out of the window; it glanced. I don't think the bottle broke. On his throwing the glass, says Tyson, one of the proprietors of the room or store said to him: "What in the deuce do you mean?" and just about that time the deceased jumped up and ran towards the accused and put his hands on his shoulders. Tyson tried to snatch them apart, and said: "Don't do that boys," but did not get them apart. Defendant backed towards the door, Lasley having his

hands upon him. Lasley said to the defendant : "I told you, Garner, I did not have any pistol, but you can't bulldoze me." Just as the accused backed out of the door, and the deceased was in it, they being right together, as they were right before, and the latter having his hands on the accused, and Tyson being by Lasley with his hands on him, the accused shot, striking Lasley in the abdomen, and as soon as this shot was fired, the three "rushed out on the sidewalk in front of the house. Just as they got in the door, and before the first shot, Tyson said to accused : 'Garner don't do that, it will cost you trouble,'' and Lasley said : "Yes, it will cost you trouble." After they all got out, Lasley, according to Tyson's statement, seems to have started towards the door of his own office, which was ten or fifteen feet south of the door they had come out of, and Tyson seeing or thinking that Garner was going to shoot again, said to him : "My God Almighty, Pete, don't do that." Garner shot him again, and Tyson and Lasley each said : "Don't do that." Lasley fell at the second shot and Garner followed him up and shot three more times, Tyson saying to him : "Garner, don't do that, the man is dead; what do you want to shoot him for?" Garner then turned to Tyson and said : "God damn you, I will shoot you," and his pistol snapped, he having shot out all his bullets. Lasley was in his shirt sleeves, and had no arms in his hands or on him, and was seen to make no effort or act outside of what has been stated. Garner, when first noticed, had a pistol buckled around

him, or sticking in the waist-band of his pants, and visible to everybody. There had been an excursion that day, and the witness states that none of the parties were drunk, but all had taken a drink, and Garner was the drunkest man there. Painter, one of the proprietors, says when he first noticed Garner and Lasley they appeared in the room together, and after speaking of the bottle and glass he says: "And then he and Mr. Lasley and Dr. Tyson, and they all seemed to quiet Garner, and I heard Lasley remark to him: "Garner we have been out and had a talk, and I told him I did not have a weapon of any kind." From that they went out of the door. Painter started along with them, and heard, but did not see, the fourth shot, and looked out on hearing it, and noticed what was going on, and walked on further towards the door and heard Lasley say: "Don't do that," and at that time Garner shot him. He then describes the subsequent shooting. Garner was doing no business at the room. There "were three lamps, with a lantern." There was a back room to the house, and Painter thinks Lasley and Garner had come in from the back room, saying they had been back that way. That Garner made no offensive remarks to Lasley or to himself that he, witness heard. That Garner, Lasley and Tyson went out of the door; noticed them as they started out; Lasley had his hands on him; all there together; thinks Lasly was trying to get Garner out; this was his idea. He did not hear Lasley tell Garner he could not bulldoze him, but heard of it; that when Lasley said to Garner.

that he did not have any pistol or weapon of any kind, Garner was not speaking to him that witness heard; that Cranford and witness had a shop in the room, and Lasley kept their books. Lasley had no arms, was in his shirt sleeves. Another witness, Cranford, who was in the room and describes his position as being to the right and rear of Lasley, and five or six feet from him, says that Lasley said to Garner just before he shot: "I have had a conversation with you, and told you that I had no pistol or any kind of weapon;" that he did not see Lasley throw his hand to his hip pocket; that Lasley did not throw his hand back; and that there was no pistol found in the house; that he was looking directly at him. Tyson and Garner were at the door, and Tyson had caught Garner's arm, and he did not see Lasley put his arm behind him. Being asked in what position Lasley was standing, he said they were "mixed up together;" that witness stood still as they advanced towards the door until they got out of it; that when the firing commenced they were just outside the door, they were all together, no firing until they got out of the door; could not tell how Lasley was standing; it was a kind of a scuffle; it took a mighty little time for them for get to the door; does not think Lasley could have put his hand to his hip pocket without his seeing it; was not anticipating any difficulty; did not know there was anything between them. From the time they went together he expected a difficulty; was watching them.

The account which A. J. Winburn, a witness in be-

half of the defendant, gives of the killing, is as fol-
lows : He says that he was present, but "out doors"
when the difficulty occurred, " outside to the left of
the door," was standing with his face towards the
house and his arm resting on the railing that went up-
stairs, and he could see through the glass window into
the building. Witness makes a diagram; that he could
see very plain through the widnow; was six or seven
feet from the door; saw Painter, Cranford, Garner,
Lasley and Tyson through the window; Painter was
behind the counter; there were two counters; Painter
was behind the one on the left hand side as you go in-
to the house, or on the south side, behind the same
counter that Cranford was. Garner was standing in
the house about opposite to Painter and Cranford, but
further back in the house. Lasley was right in front
of Garner. Question: Where was Tyson? Answer:
A little to the right, and when witness "heard the
lumbering going on he" (Tyson) "was a little to the
right of Lasley and Cranford when" witness "heard
the lumbering commence." Witness further says a
pistol was fired; Garner fired it at, it seemed, Lasley;
at this time Lasley had his left hand on Garner, "and
to the best I could tell, he had his right hand behind
him that way" (showing, as if putting the right hand in
the hip pocket). On being asked how far this was
from the east door, he replied that he supposed it was
" not over four or five feet inside of the door, it was just
inside." He also stated that two shots were fired in-

side the house, and that Garner fired the second shot; that Tyson and all three came out together, and Lasley turned and made for his office; three or four shots were fired. As Garner and Lasley were approaching Lasley's front door they were all jumbled up together, all three of them, Tyson, Garner and Lasley. Tyson was thrown out some to the left of the others. Lasley started out when the first shot was fired. Garner was going backwards when Lasley had his left hand on him, and his right hand in the way indicated by witness. On cross-examination, the witness stated that he was sworn before the coroner at the inquest at Branford, and acknowledged his signature to the evidence taken down, and said that he thought he had stated that Lasley had his hand on his his hip, and being asked if he had stated "that he saw them through the window," replied, "I did sir. I think I gave the same statement to-day that I made, gave before the coroner's inquest," and further, that Garner was going backwards, and that Lasley was following him. Here this mode of examination being objected to, the prisoner insisting that all of the evidence of the witness before the coroner should be read to him, and he then be asked if he made "such and such a statement," which objection was sustained, and the State Attorney proceeded to read the evidence. Of this testimony it is necessary to say no more than that it contains no statement as to the throwing of the hand to the hip pocket. Wit-

ness continuing, says that he and Hart went out together and turned to the left, which threw them on the right as you go into the building, and that he saw the firing in the house through the window; that the first thing that attracted his attention to the house was hearing "something go like it was thrown, and also some loud words, and this caused me to look in;" that he heard Mr. Cranford say inside the house, "Pete, don't do that;" think it was him that said it. Witness had seen Garner in the room before going out. Garner had a pistol fixed in his waist-band. Lasley was in his shirt sleeves; his hip pocket exposed to view. Question: "Was he armed with a pistol?" Answer: "No sir; I never saw any, but he was like a good many other people, he could carry it in his shirt sleeves and not be seen." Heard Lasley say to Garner, "that is the way to carry them, not concealed." That his testimony at the inquest was read over to him before he signed it. Was standing with his right hand on the stair railing; was standing not over three feet from the window; that it gave him a plain view inside the house. That when Hart and witness walked out the crowd was all about the middle of the store. The stair case ran out a little, about or probably three feet further than the house. The window is not exactly square behind the counter. Painter and Cranford were over on the other side. Lasley was at L (in house) when he bent over; saw Lasley when he fell;

he fell so that his cheek struck the door step; there was a bruise where he struck the steps; two shots were fired after he fell; suppose Garner was in two feet of Lasley when he fell down before the last two shots were fired; Garner had followed him up. Didn't see any weapons on Lasley at all. The reason why I thought Lasley was hit in the stomach was because he bent over that way (showing). Lasley's face was towards me, and Garner's the other way.

J. J. Lassiter, a witness for defendant, testified that he was between Bexley's store and the Garner house when the shooting commenced. Bexley's store is immediately across the street. Did not see the shooting, only that which was done outside. There were two shots fired on the inside of the house, and thinks there were three more on the outside, in front of the building. First two shots were fired in Garner's house. Cranford was doing business there; it was a store where goods were sold. Witness was a little "hard of hearing."

The other facts of the case are stated in the opinion.

*J. S. White* for Plaintiff in Error.

*The Attorney-General* for the State.

RANEY, C. J. :

The defendant was convicted of murder in the first degree in February last in the Circuit Court of Suwannee county.

1. The first error assigned is the "overruling of the defendant's motion for a continuance and forcing him to trial while his attorney was too sick to properly conduct the defense."

The bill of exceptions shows that on the 18th day of February, L. B. Clifton was, on the application of counsel on both sides, sworn as stenographer, and the State Attorney announced ready, and, in answer to a question whether the defendant was ready to proceed, Mr. Grant, defendant's counsel, stated that he had not yet been furnished with a copy of the indictment, and the names of the special venire summoned in the cause, and demanded that he be now furnished with them. The court directed the clerk to furnish them, and suspended further proceedings in the case until it was done, giving an hour's time. At the expiration of the hour, when this had been done, Mr. Grant being asked if he was now ready to proceed, made a motion for a continuance, stating in his place at the bar that he was sick and unable to conduct the case, and that he was sole counsel in the cause. To this motion the court responded, stating in substance, that on the tenth day of the month the case was sounded and set for the eighteenth day, and under that agreement the State's witnesses were discharged till the 18th; and that on the 17th at noon, during a trial of a murder case in which Mr. Grant was counsel for the defendant therein, the court was moved for a special venire to try the present cause, the defendant being in court. That no objection was then made to going into the case, nor

any intimation given of any physical inability upon the part of counsel. That the court, on the 17th, after conferring with the sheriff and clerk, and asking the opinion of Mr. Grant, which he declined to give, ordered a special venire of fifty talesmen. The court further observed that 146 names had been drawn from the box prior to this order, which, with these fifty would leave only 96 to serve during the next "year;" that he thought it was the duty of the counsel "on yesterday when this question was brought up, and the court distinctly stated that he would not summon the special venire if the case was not ready for trial. No objection was made on the ground of physical disability, and the order was made and has been executed by summoning the talesmen who are now present in court. If Mr. Grant has since been taken sick, so as to render it unsafe for him to represent his client, that fact would appeal to the court and to the State Attorney, but there is no evidence here, nor certificate of any physician, nor does Mr. Grant make an affidavit himself." The court further stated that he would give counsel an opportunity to present a certificate, and would also order a personal examination of counsel, and notified both client and counsel that if the latter was physically unable to conduct the case, that the former must obtain additional counsel, and then gave counsel until "two o'clock" to amend his motion as he might deem proper, and appointed Drs. Carroll and Overstreet to make a personal examination and report to the court, and notified the prisoner that he must secure addition-

al counsel if the report showed his counsel's "inability." To this ruling counsel excepted. Mr. Grant, after a recess, presented his affidavit and asked that it be filed. This affidavit is to the effect that he was "the only counsel in the case," and that he "is physically unable on the trial of said cause to properly represent the said I. T. Garner as his counsel." A report signed by Drs. Airth and Carroll was also filed, which is as follows: "We hereby certify that we have carefully examined D. F. Grant with reference to his physical condition and general health, and we find him convalescing from an attack of the grippe. Mr. Grant is not in a prime condition of health, although not, in our opinion, entirely incapacitated," etc. The court then observed that it was advised and knew that on yesterday Mr. Grant made an able defense in a capital felony case; that he came into court this morning and entered into the defense of a client charged with a felony, with his usual skill, and that after the special talesmen were in court and this case sounded for trial, and after being present last week and this week in court he then, at the last moment this morning, asked for copies of the indictment and venire, thus delaying the court for an hour, and he also consented with the State Attorney to employ a stenographer to take the testimony, who was sworn in in his presence before the motion for a continuance was made. Also that it had "come to the knowledge of the court that Major Gallaher has been employed to assist in the defense." The court then denied the motion, stating that upon the comple-

tion of the jury the case would be adjourned until to-
morrow, so as to give Mr. Gallaher an opportunity of
conferring with his witnesses, and other counsel. To
this ruling, counsel for defendant excepted, and Mr.
Grant then offered a certificate of a doctor in reference
to the sickness of a witness for defendant, announcing
that his purpose was to learn if the certificate was suf-
ficient to excuse the witness from coming, the court
answering that it was not, and that if the counsel
wished an attachment, to which counsel replied that he
would telegraph for him, and thought he would come.

The failure to assign this ruling as a ground in the
motion for a new trial was not a waiver or abandon-
ment of it. DuPuis vs. Thompson, 16 Fla., 69 ; Par-
rish vs. Pensacola & Atlantic R. R. Co., 27 Fla., 403,
9 South, Rep., 696. A question of this kind rests in
the sound discretion of the trial court, yet an appel-
late court would not hesitate to interfere where it was
shown that such discretion had been exercised to the
injustice of the prisoner, or been abused. Newberry
vs. State, 26 Fla., 334; 8 South. Rep., 445. It is ap-
parent that the judge did not participate in counsel's
distrust of his physical ability to properly represent
his client ; and it is evident that he did not think there
had been any such change in his physical condition
since the order of the 17th of February for the special
venire, as impaired the professional qualifications he
had exhibited throughout the week preceding, and up
to the motion for a continuance. Such a change, it is
true, might have taken place since such order, and even

just before the entry of the motion, and the circumstances of a case might be such that it would be a great wrong, in fact a patent denial of justice to a client, to force him to employ new counsel unacquainted with the facts and uninformed by due study of the proper defense to be made, and to an immediate trial, or to one even during the term.    Under such circumstances of course the question of the issue and service of the special venire, the presence of the talesmen, the number of names in the jury box, and everything incidental to such questions, would be entirely subordinate to the rights of the accused, whose justice and fair trial, and not the convenience or gain of his counsel, are the objects to be secured, or kept from harm.    But here no such change in condition is exhibited, nor does the showing made present any other facts which authorize our interference.    Mr. Grant's affidavit is merely a general statement of his physical condition, and though made after the court's suggestion as to the possibility of any such change subsequent to the issue of the venire, he does not mention anything on this point, nor does he state any substantive fact upon which the judgment of an appellate court could act in forming a conclusion as to a person's physical condition; and besides this, the report of the physicians, whatever weight should be attatched to it as evidence, is so indefinite as to leave us uninformed as to his exact status between the extremes of "prime condition" and of being "entirely incapacitated."    Considering these features of the application, and what Mr. Grant had been able

to do prior to the motion, and that, as the bill of exceptions show, he continued in the defense of the cause, examining and cross-examining all the witnesses, with one or two exceptions, and that no attempt is made to designate any particular wherein the defendant has suffered, and that no such claim was made on the motion for a new trial, we are forced to conclude that no injustice was done the prisoner or his counsel, nor any judicial discretion violated, in overruling the motion for a continuance.

II. The second, third and fifth assignments of error involve questions as to the admissibility of evidence of threats by the deceased against the defendant, and of the violent and dangerous character of the deceased.

Threats are admissible when they are part of the *res gestae*, or when there is doubt as to who began the fatal difficulty, and it is not material in either of these cases that they should have been previously conveyed to the defendant. Bond vs. State, 21 Fla., 738, 751-2, and authorities cited ; Myers vs. State, 62 Ala., 599. Except in the above instances, threats previously made by the deceased, whether communicated to the defendant or not, are not admissible unless there is testimony which at least tends to show that the deceased at the time of the killing had in fact or apparently sought a conflict with the accused, or was actually or apparently, making some demonstration or overt act of attack towards the accomplishment or consummation of such threats. There must be, at least apparently, such a demonstration of an immediate inten-

tion to execute the threats as will naturally induce a reasonable belief that the party threatened will lose his life or suffer serious bodily harm if he does not immediately take the life of his adversary. It must be such an act as is reasonably calculated to induce the belief that the execution of the threatened attack has been actually commenced. Bond vs. State, and Myers vs. State, *supra*, ; Smith vs. State, 25 Fla., 517 ; Evans vs. State, 44 Miss., 762 ; Payne vs. State, 60 Ala., 80 ; Campbell vs. People, 16 Ill., 17 ; Irwin vs. State, 43 Texas, 236 ; Pritchett vs. State, 22 Ala., 39 ; Pond vs. People, 8 Mich., 150. The circumstances of the killing must be such as tend to raise or support a case of self-defense. There must be, at least apparently, a hostile demonstration, or overt act of attack, tending to show that the accused was in such imminent danger.

The question of the admissibility of threats is one for the court's decision. If there is the slightest evidence tending to prove a hostile demonstration, which may be reasonably regarded as placing the accused apparently in imminent danger of losing his life or sustaining great bodily harm, the threats should not be excluded. Roberts v. State, *supra:* Dupree's Case, 33 Ala., 380 ; Horbach v. State, 43 Texas, 242 ; Holly v. State, 55 Miss., 424 ; Spivey v. State, 58 Miss., 853 ; Russell v. State, 11 Texas Ct. App., 288. They are admissible because they serve to explain the demonstration or overt acts which is the predicate for their introduction, and to show the reasonableness of the accused in believing himself in that danger which

justifies the taking of human life.   It is, however, not
to be forgotten that the weight of such threats consid-
dered in connection with the alleged overt act is, as is
the credibility of the witnesses testifying to either such
act or threats, a question for the the jury.   Myers v.
State, 62 Ala., 599; Pridgen v. State, 31 Texas, 420;
People v. Ractor, 19 Wend., 589; Howell v. State, 5
Ga., 54.   The admission by the court of either the one
or the other implies nothing as to its truthfulness or
weight.   The court discharges its delicate functions in
admitting or excluding the threats ; and it should ad-
mit them even where its mind is in a state of doubt
whether or not the alleged demonstration, considered
in connection with such threats, would be sufficient to
cause a man of ordinary prudence to reasonably be-
lieve himself to be in danger of his life or great bodily
harm, for all such doubts are to be solved in favor of
the accused ; Holley v. State, 55 Miss., 424 ; and will
not exclude them except where there is no proof of
any act tending to cause such a person to reasonably
entertain such a fear ; Bond v. State *supra ;* Smith v.
State, 25 Fla., 517; Holly v. State, *supra ;* Payne v.
State, 60 Ala., 80 ; Benfield v. State, 15 Neb., 484; but
when the court does admit them it is for the jury to
say, after considering all the testimony, whether or
not they believe the accused had even apparently rea-
sonable grounds for believing that he was in imminent
danger of life or great bodily harm, and the court is
not responsible for the manner in which juries dis-
charge this function.

Evidence of the violent and dangerous character of the deceased is admissible to show, or as tending to show, that a defendant has acted in self-defense; or, in other words, under such circumstances as would have naturally caused a man of ordinary reason to believe that he was at the time of the killing in imminent danger of losing his life or suffering great bodily harm at the hands of the deceased, but it is not admissible for this purpose except where it explains or will give meaning, significance or point, to the conduct of the deceased at the time of the killing, or will tend to do so; and such conduct of the deceased, at the time of the killing, which it is proposed thus to explain, must be shown before the auxiliary evidence of such character can be introduced. Horbach v. State, 43 Texas, 242; Hudson v. State, 6 Texas Ct. App., 573; Franklin v. State, 29 Ala., 14; Eiland v. State, 52 Ala., 322; Roberts v. State, 58 Ala., 126. There must be upon the part of the deceased some demonstration, which, though considered independent of the dangerous character of the deceased it would be regarded as innocent or harmless, when received and considered in connection with or illustrated by such character, may arouse a reasonable belief of imminent peril of the kind indicated above. Hudson v. State, *supra;* Spivey v. State, 58 Miss., 858; State v. Robertson, 30 La. Ann., 340; Pritchett v. State, 22 Ala., 79. Where there is no evidence tending to show that the killing was in self-defense, or any conduct upon the part of the deceased from which, even assuming that he is a violent

and dangerous man, any inference can reasonably be drawn that he intended the immediate perpetration of an act imminently dangerous to the life of the accused, or of serious bodily harm to him, the testimony is inadmissible. In such cases there is no conduct, to be illustrated or explained by the character under discussion. Bond vs. State, *supra;* Irwin vs. State, 43 Texas, 236; Hudson vs. State, *supra;* Bowles vs. State, 58 Ala., 335; Eiland vs. State, *supra;* Franklin vs. State, *supra;* Pritchett vs. State, *supra;* People vs. Edwards, 41 Cal., 641; State vs. Hicks, 27 Mo., 589; People vs. Garbutt, 17 Mich., 9. The admissibility of the evidence is not confined to cases in which there is doubt of the guilt of the accused, or of the degree of the homicide, or that the killing was in self-defense. Eiland vs. State; Franklin vs. State and Horbach vs. State, *supra.* If there is at the killing any demonstration upon the part of the deceased which his dangerous character would reasonably and naturally aid, explain, or give point or significance to as tending to make out a case of self-defense upon the part of the accused, evidence of such character should be admitted. The philosophy of the introduction of this kind of evidence is founded in human nature. Though in the eyes of the law it is no less a crime to kill a brutal, dangerous or otherwise bad man, without apparent cause for reasonable belief upon the part of the slayer of imminent danger to his life, or of serious bodily harm, creating an immediate necessity for the killing, yet the same menacing demonstration, which made by

a man of peacable and law-abiding character would suggest no sense of danger, would when made by one of a violent and dangerous nature reasonably and naturally arouse genuine feelings of imminent danger to life, or of great bodily harm. Men who are assailed act in defending themselves with promptness and force in proportion to the violent and dangerous character of the assailant. The law in deciding whether or not a person has in slaying another acted under a reasonable belief that he was in imminent danger of life or great bodily harm considers all the circumstances, and among others the dangerous character of the deceased when it is by the circumstances of the killing rendered admissible in evidence, or becomes a part of the *res gestae*, as it is and does where it illustrates the conduct of the deceased. The accused is entitled to have the jury see all the circumstances as they existed, and to judge him accordingly. This they could not do if, in such cases, the dangerous character of the deceased was kept from them. Horback vs. State, *supra;* State vs. Bryant, 75 Mo., 75, 78-9 ; State vs. Keene, 50 Mo., 357; State vs. Hicks, 27 Mo., 583 ; Hurd vs. People, 25 Mich., 405 ; Monroe vs. State, 5 Ga., 85, 137; Pritchett vs. State, 22 Ala., 39. What has been said above as to the respective functions of the court and jury is applicable also in this connection.

Proof of the character in question is to be made by evidence of the deceased's general reputation in the community for such character, and not by evidence of specific acts or general bad conduct. Wharton's Cr.

Ev., secs. 57, 58; Wesley vs. State, 37 Miss., 327; Keener vs. State, 18 Ga., 194; Dupree vs. State, 33 Ala., 380.

An application of these principles to the facts of the case is necessary.   D. F. Grant, a witness for the accused, was asked whether he knew of Lasley's making any threats in reference to taking defendant's life within a few days prior to the killing, and if these threats were communicated to defendant.   The State objected, and the court sustained it, on the ground that there had been no overt act proved which would cause the defendant as a reasonable man to believe his life in danger, and stating " that the only remark that would indicate that there was any trouble was when the deceased, on Garner's coming into the store with a pistol in his waist-band, said to him :   " Pete, that is the way to carry them; not concealed."   No exception was taken to this ruling.   Counsel for the prisoner then announced that he proposed to ask the witness : " Did you see Mr. Lasley engaged in loading that gun, a Winchester rifle, in his office; and if so, what did he say he was loading the gun for, and what he intended to do with it after he had loaded it ?"   In reply to a question by the court, counsel stated that this question was propounded for the purpose of proving threats, and thereupon the court sustained the objection of the State to the question, and the defendant excepted to the ruling.   The prisoner also offered to prove by one Lassiter that Lasley said that Garner had thrown a beer bottle through the window of his office, and that

if the damned town council did not arrest and fine him, he (Lasley) would wait till 12 o'clock, and then kill him himself; and that this conversation occurred some four or five days before the killing; and by one Thurman that Lasley was a man of very violent character, and that he had previously killed two men; and by D. F. Grant that four or five days before the killing he (Grant) entered the office of Lasley and found him engaged in loading a repeating rifle, and that Lasley said to Grant : "See what they have done" (pointing to a hole in the window pane), "and I am fixing for them, and am to get them," and that Grant becoming apprised that Garner had thrown a beer bottle through the window, told him that he had better arrange the matter was Lasley, or keep on his guard. The State objected to these several matters, and the objection was sustained and the ruling excepted to.

There were subsequent renewals of these offers of testimony, and exceptions to the court's rulings refusing to admit the evidence.

In view of the testimony of Winburn as to the position of Lasley at the time the first shot was fired, which was, that he had his left hand on Garner and, it seemed, to the best he could tell, his right hand behind him as if putting it in his hip pocket, we think the Circuit Judge erred in refusing to admit the testimony of the deceased's threats and of his reputation as a man of violent and dangerous character. It is true there is a positive conflict between Winburn and the State's witnesses as to whether the pistol was fired at all in the

house. The latter state in effect that the accused was outside when he fired the first and subsequent shots, but Winburn says that two shots were fired inside, and in this statement he is sustained by Lassiter; but neither we, nor the Circuit Judge, have, in so far as the admissibility of testimony as to threats and character is concerned, anything whatever to do with the question of the credibility or weight or relative credibility or weight of the testimony of these witnesses. Winburn's testimony is to be dealt with, in this connection of the admissibility of evidence as to threats and character upon the assumption that the jury may believe it, and viewed in this aspect it cannot be said that there was not any or the slightest testimony tending to show that the accused had reasonable cause to believe himself in the danger specified above as being necessary to its admissibility; or, in orther words, that there was no testimony of any act or conduct upon the part of deceased which previous threats would explain or show the *quo animo* of, or a violent and dangerous character would illustrate or give significance to. Fitzhugh vs. State, 13 Lea, 258. The mistake which, to our minds, the Circuit Judge has fallen into is in not distinguishing between the admissibility and weight of evidence. Whether or not, considering the conduct or act of the deceased, testified to by Winburn, in connection with any evidence of threats or of violent and dangerous character or both, that may be testified to, there was in view of the whole testimony or all the circumstances of the killing, reasonable ground, either

really or apparently, for the accused to believe that he was in imminent danger of losing his life or receiving great bodily harm at the hands of the deceased unless he then and there took his life, is a question for the minds and consciences of the jury in judging between the prisoner and the State. Wood vs. State, 92 Ind., 269, 274-5. The admission of the evidence that may tend to prove a conclusion is never an intimation that such conclusion has been or will be proved. Our system of jurisprudence denounces any such intimation by the court, and of course ignores any unjustifiable inference by the jury of such intimation, upon the part of the court in admitting evidence. After carefully considering the entire evidence as to the circumstances of the killing, the substance of which is given in the statement of the case, we find nothing in it justifying a different conclusion as to the *admissibility* of evidence of threats by the deceased, and of his reputation as a person of violent and dangerous character.

Evidence that the deceased had previously killed two men, or anyone, or any evidence of specific acts or general bad conduct, is upon principles announced above, inadmissible. Fitzhugh vs. State, 13 Lea, 258.

III. It appears from the record that the State requested that the testimony of Winburn taken before the coroner should be turned over to the stenographer, to be attached to the record, and it was ordered accordingly. After it had been turned over to the stenographer the defendant objected on the ground that

the proof showed that it was not the work of a judicial officer, but by a mere outsider. The ruling on this objection and the exception thereto, as shown by the bill of exceptions, are as follows: "On the cross-examination of the witness Winburn, on yesterday he was asked by the State Attorney if he had been a witness at the coroner's inquest, and asked some questions showing a discrepency between his testimony there and here. Counsel for defendant then objected to that manner of interrogating the witness, and claimed that all of his evidence as given before the coroner should be read over to him before he should be crossed upon it. The court ruled that that was proper, and the testimony was so read to him. The court now rules that for the purpose of identification of that paper in connection with the cross-examination, that it may be filed with the stenogragher. To which ruling of the court, defendant by his counsel excepts."

It also appears that immediately after this ruling the counsel for the prisoner proposed that he should be allowed, (inasmuch as the State's witness, Spence, had stated in his evidence that two or three days before the killing the defendant had said in his presence that the deceased accused defendant of throwing a beer bottle through deceased's window, and that he, defendant, was getting damned tired of it, and that it had to be stopped) to prove by Grant and Lassiter that the deceased four or five days before the killing had

accused the defendant of throwing such a bottle through the window of his office, and had said that he was loading his Winchester rifle to shoot the defendant with, and that they informed the defendant of such threat before the killing. The State objected, and the court ruled as follows: "The question of the admissibility of evidence of threats is the question before the court; as to whether threats ought to be admitted, threats of the deceased towards the accused. Now, it is insisted that inasmuch as the State has proven expressions of bad blood on the part of the defendant, growing out of an alleged accusation, that therefore, defendant should be allowed to prove that it was true that such an accusation was made, and that it was coupled with threats of violence. The question as to the admissibility of threats, says our Supreme Court, in the very elaborate opinion, does not depend upon the right of the accused to explain why he made threats, but it depends upon whether at the time the homicide was committed, they were admissible to show that he had a reasonable apprehension to believe that he was then and there in danger; and the Supreme Court has held that although he may have had these threats communicated to him, threats of great personal violence, even closer in time than you went, that unless there was some overt act indicative of the intention or design to carry those threats into execution, then those threats would not be admitted. They say

that from all the circumstances, all the surroundings, that if there was not apparent real danger at the time of the homicide, then previous threats by the deceased cannot be admitted.  Now, you take the circumstances of this case, I need not recite them; I do not desire to harrow the feelings of this poor young man, but was there, to a prudent and cautious man such apparent danger to him, coupled with these circumstances and surroundings, as would justify him in slaying Lasley, as was done—such apparent danger to his life or person as would justify the killing.''   This was followed by a reference to a ruling made by the judge in a case in Hamilton county, and the overruling of the application for admission of the evidence and an exception to such ruling.

It is contended by counsel for plaintiff in error, that language used by the judge as to questions showing a discrepancy between Winburn's testimony before the coroner's jury and that on the trial, was calculated to impress the jury with the idea that the judge was intimating that Winburn had lied at one of the occasions, or to, at least, discredit him with the jury; and that the discrediting effect upon the minds of the jury of this language as discrediting Winburn was ''cemented'' by the language used in the subsequent proceedings in deciding that no overt act had been proved.  We are entirely satisfied that remarks made by a judge in trial of a cause, as to the credibility of a witness, or as to the weight of any evidence, relevant to the issue, however inadvertently they may have been made, are

10

an improper assumption of, or infringement upon, the province of the jury, and when duly excepted to, are grounds for assigning error by the party to whom they may seem prejudicial, and of reversal. It is the province of the court to pass upon the admissibility of evidence, but when it is in, its credibility and weight are questions for the jury. The guarantee which our statute gives against the court throwing the weight of its opinion as to any question of fact when charging a jury, would be of little or no benefit to litigants if judges were at liberty to intimate the same opinions in making rulings, or otherwise, in the progress of a cause. The policy of our jurisprudence is that the jury shall decide all such questions of themselves, and entirely liberated from the influence of an intimation of the judge's impressions. Thompson on Trials, sections 218, 219; Proffatt on Jury Trials, sections 322-324; State vs. Harkin, 7 Nev., 377; State vs. Tickel, 13 Nev., 502; McMinn vs. Whelan, 27 Cal., 300; Gibson vs. State, 26 Fla., 109; 7 South. Rep., 377; State vs. Parker, 66 N. C., 624; Commonwealth vs. Foran, 110 Mass., 179; Fost vs. Yielding, 28 Ala., 658; Sims vs. State, 43 Ala,, 33; Williams vs. State, 47 Ala., 639; Walker vs. State, 37 Texas, 365; State vs. Baker, 8 Md., 44.

We do not think the remark of the judge as to the question propounded to Winburn can fairly be regarded as one concerning his *credibility* or the weight of any *evidence*; it is, we think, only a statement of the purpose of the questions propounded by the State Attorney, and being such, it was not objectionable.

Our views as to what was said by the judge as to there being no evidence of an overt act, have been fore-shadowed by our conclusions already announced, as to the admissibility of evidence as to threats and character. Had there been no evidence whatever tending to prove an overt act, no harm could have resulted from his observations; Metzger vs. State, 18 Fla., 481; but there was such evidence, and where there is evidence tending to support an issue it must be left to the jury. Bryant vs. State, 3 Johns (Law), 257; Williams vs. State, *supra*; Walker vs. State, *supra*.

Whether or not an exception simply to the "ruling" or "decision" of a judge is sufficient to support objections to language or observations having a tendency to influence the jury in the manner indicated above, we do not now decide, it being unnecessary as the case has to go back for a new trial on other points. It is certainly better and is due the court and may be indispensable that the specific objection of the tendency to such influence should be made.

IV. It is also assigned as error that the jury was not sworn in accordance with the requirement of the statute. The record, as shown by the transcript before us, after stating that the prisoner was arraigned and pleaded not guilty, states: "Whereupon came the following jurors," naming them, "who were duly selected, chosen, empaneled and sworn to try the issues joined." The statute (sec. 12, p. 447 McClellan's Digest) provides that in capital cases the following oath shall be administered: "You shall well and truly

try and true deliverance make, between the State of Florida and the prisoner at the bar, whom you shall have in charge. So help you God." The oath prescribed by the same section for cases not capital is : "You shall well and truly try the issue between the State and prisoner at the bar according to the evidence. So help you God."

No objection was taken to the oath at the time of its administration, nor, we may remark, at any time in the lower court. The rule in civil cases is, that the objection should be made at the time the oath is administered, and cannot be made primarily in the appellate court. Seymour vs. Purnell, 23 Fla., 232; J. T. & K. W. Ry. Co. vs. Neff, decided at the present term. If the record in a criminal case purports to recite the oath as it was administered, and the oath appears to be substantially different from that prescribed by law, it seems that a reversal will result; on the other hand, if the record does not so purport, but merely imports that the jurors were in fact sworn, without negativing the presumption that they were duly sworn, the entry is sufficient, and in better form than if the prescribed oath were recited word for word. Thompson and Merriam on Juries, secs. 298, 299, and authorities *infra*. The contention of counsel for plaintiff in error is, that the record in this case does purport to give or recite the oath administered, and he is not without authority to sustain his position. Upon principle, and what we deem the better authorities, our opinion is, that the

entry here should not be thus construed. It is not the duty of the clerk in writing up the minutes or the record of the proceedings of a trial to incorporate the form of the oath administered to the jurors; no more is necessary, or really proper than to make the record show that the jury were in fact sworn according to law. Mitchell vs. State, 58 Ala., 417; Dyson vs. State, 26 Miss., 362; Thompson and Merriam on Juries, sec. 299. In England though the form of the oath in criminal cases was, and is now so far as we know : " You shall well and truly try, and a true deliverance make between our sovereign lord the King (or lady the Queen) and the prisoner at the bar, whom you shall have in charge, and a true verdict give according to the evidence; so help you God." 1 Bishop on Criminal Procedure, sec. 983; Patterson vs. State, 7 Ark., (2 Eng.), 59; State vs. Jones, 5 Ala., 666, 673; yet, as to the point in question, the form of entry in even a murder trial was : " And the jurors of the said jury, by the said sheriff for this purpose empaneled and returned, to-wit : (naming them) being called, come, who being elected, tried and *sworn to speak the truth of and concerning the prisoner*, upon their oath say." App. to 4 Blackstone's Com.; State vs. Pearce, 14 Fla., 153. It is apparent that no part of this entry was intended as a recital of the above oath, but that the italicised words were meant only as a form of stating that the jurors were duly sworn. There is no statute or rule of practice in our State mak-

ing any change in the purpose of this record entry.
The record entry is not intended to show how the
jurors were sworn, but merely to show that they were
actually sworn, and the presumption is, as it is to all
similar proceedings, that the swearing was legally done,
unless the record shows the contrary and overcomes
the presumtion.    If any exception is taken at the time
to the manner in which the swearing is done, which
swearing is always done orally in the presence of the
court, the prisoner and the counsel of both parties, the
proper mode of preserving and manifesting the form
and manner of doing it, and the exception thereto, is
a bill of exceptions; (Dyson vs. State, 26 Miss., 360;)
and in the absence of such a bill of exceptions, it will
be presumed, as in other matters *in pais*, that there
was no error in doing it unless the solemn record of
the court shows expressly that there was error.    Upon
the same principle the entry of a judgment recites *in-
ter alia*, that the jury heard the evidence, yet if it is
desired to preserve or show what the evidence was, and
any ruling and exception as to it, a bill of exceptions
is the only proper method of doing it.    The real func-
tion of the ordinary record is merely to show that evi-
dence was adduced to the jury, as it shows that the
jurors were in fact sworn.    It being inconsistent with
the duty of the clerk, and with the functions of the or-
dinary record that the terms of the oath should appear
on such record, and consistent with both, that such

record should merely show that the jurors were in fact
sworn, the legal presumption must always be that no
more was intended by the clerk in making this record,
and the Circuit Judge in signing and approving it, as
he is required to do before the adjournment of a term;
sec. 6, p. 174, McClellan's Digest; and this principle
will prevail unless there is something in the entry
which clearly negatives it.    Keeping in mind this prin-
ciple, the logical conclusion to be drawn as to the entry
in question before us is that it does not recite, and was
not intended to recite, either of the oaths prescribed
by the statute and set out above, but only purports to
state, and was intended to state that the jurors were in
fact dully sworn to try the issue which had been joined
in this case; or, in other words, that the oath prescribed
by the statute for capital cases had been administered
to them in this cause; or, in other words, that the oath
prescribed by the statute for capital cases had been ad-
ministered to them in this cause for the trial of the
issue shown by the record to have been joined.    No
other conclusion is consistent with the statement that
they were "duly sworn  *  *  to try the issue joined;"
and such statement imports, *ex vi termini*, that they
were sworn according to the formula prescribed by law
for all similar cases.    This conclusion is fully sustained
by the following authorities :  State vs. Pile, 5 Ala.,
72; Crist vs. State, 21 Ala., 137; McGuire vs. State, 37
Ala., 161; McNeill vs. State, 47 Ala., 499; Edwards vs.

State, 49 Ala., 334; De Bardelaben vs. State, 50 Ala., 179; Moore vs. State, 52 Ala., 424; Blair vs. State, *Ibid*, 343; Bush vs. State, *Ibid*, 13; Mitchell vs. State, 58 Ala., 417; Dyson vs. State, 26 Miss., 362; Anderson vs. State, 34 Ark., 257; Russell vs. State, 10 Texas, 288; State vs. Schoenwald, 31 Mo., 147; State vs. Ostrander, 18 Iowa, 435; Bartlett vs. State, 28 Ohio St., 669; Smith vs. State, 4 Neb., 277; Mann vs. Clifton, 3 Black., 304; Smith vs. State, 25 Fla., 517. There is nothing in Potsdamer vs. State, 17 Fla., 895, that precludes this view.

V. The court charged the jury that "voluntary intoxication or drunkenness is no excuse for crime committed under its influence, nor is any state of mind resulting from drunkenness short of actual insanity or loss of reason any excuse for a criminal act. If a person is sober enough to form the intention to shoot another, (and actually does shoot and kill him without justification or excuse therefor) then the law presumes that such person is sober enough to form a premeditated design to kill the person shot, and in such case he is criminally liable for his acts. One who commits a criminal act under the influence of passion or revenge which may temporarily dethrone his reason, cannot be shielded from the consequences of his act by showing that at the time the crime was committed he was under the influence of intoxicants taken voluntarily by him." The defendant excepted, in his motion for a new trial, to the giving of the first two sentences of this charge, but did not except then, or pre-

viously, to the third sentence. No exception can be made primarily in the appellate court to a portion of a charge. This is the established practice; still, as the cause has to go back for a new trial, we will consider the entire instruction as set out above.

It is true that voluntary intoxication, as distinguished from a state of fixed or settled frenzy or insanity, either permanent or, as in case of *delirium tremens*, intermittent, does not *excuse* a homicide or any other act which, but for such intoxication, would be criminal, though the immediate effect of the intoxication be to render its subject unconscious, for the time, of what he is doing, or temporarily insane; or, in other words; it does not relieve of its criminal character an act which, committed under the same circumstances, omitting the immediate obliviousness or insanity produced by such intoxication, would be a crime in the eyes of the law. This is the general rule applicable wherever the voluntary doing of the wrongful act itself constitutes the crime, or a particular or specific intent is not an essential or constituent element of the offense; and in all such cases a person who is at the time of the commission of the act unconscious or insane, as the immediate consequence of voluntary intoxication, is liable in the same manner, and to the same degree that he would be if sober. Whenever, however, a specific or particular intent is an essential or constituent element of the offense, intoxication, though voluntary, becomes a matter for consideration, or is relevant evidence, with reference to the capacity,

or ability of the accused to form or entertain the particular intent, or upon the question whether the accused was in such a condition of mind to form a premeditated design. Where a party is too drunk to entertain or be capable of forming the essential particular intent, such intent can of course not exist, and no offense of which such intent is a necessary ingredient, be perpetrated. "Drunkenness," says Mr. Bishop, (sec. 400 Criminal Law,) "does not incapacitate one to commit either murder or manslaughter at the common law, because to constitute either, the specific intent to take life need not exist, but generally malevolence is sufficient. But where murder is divided by statute into two degrees, and to constitute it in the first degree there must be the specific intent to take life, this specific intent does not in fact exist, and the murder is not in this degree where one, not meaning to commit a homicide, becomes so drunk as to be incapable of intending to do it, and then, in this condition kills a man. In such case the court holds that the offense of murder is only in the second degree." Of course if one, "meaning to commit a homicde," becomes intoxicated voluntarily, thus "to nerve himself up for the occasion," as is often expressed, and as may be done, intoxication will not have any effect upon the act and intent thus carried out. Where a premeditated design to effect the death of the person killed or of some human being is essential to the offense of murder in the first degree, which it is in this State, drunkenness or intoxication, though voluntary, is rel-

ative evidence to be considered by the jury as effecting the capacity of the accused at the time of the killing, to form a premeditated design to effect the death of the person killed or any human being. If a jury find from the evidence that the defendant was at the time of the killing so much intoxicated as to be incapable of forming a premeditated design, or of deliberating sufficiently to form such a design to take the life of the deceased or any human being, (Savage and James vs. State, 18 Fla., 909,) and yet that, but for this incapacity, the defendant would be guilty of murder in the first degree, they cannot find him guilty of murder in the first degree, because of such premeditation is essential to the offense of murder in the first degree, as any other element of it. 1 Bishop on Criminal Law, secs. 400, 401, 406, 408, 409; 1 Wharton's Criminal Law, 48, 55; Shannahan v. Com., 8 Bush, 464; Boswell's Case, 20 Gratt., 860; Jones .vs. Commonwealth, 75 Penn. St., 403; Pirtle vs. State, 9 Hump., 663; Lancaster vs. State, 2 Lea, 575; Cartwright vs. State, 8 Lea, 377; Hopt vs. People, 104 ; U. S., 631 ; State vs. Donovan, 63 Iowa, 369; Woods vs. State, 34 Ark., 341; State vs. Bell, 29 Iowa, 316; U. S. vs. Roudenbush, 1 Baldwin C. C., 514; Scott vs. State, 12 Texas Ct. App., 31; Roberts vs. People, 19 Mich., 401; People vs. Cummins, 47 Mich., 334; State vs. Welch, 21 Minn., 22; Kelly vs. State, 3 Smedes & M,, 518; Wenz vs. State, 1 Texas Ct. App., 36; Keenan vs. Commonwealth, 44 Penn. St., 55; State vs. McCants, 1 Spears, 384; Tibwell vs. State, 70 Ala., 33; State vs.

Johnson, 41 Conn., 585; Cross vs. State, 55 Wis., 261. It is not held that such intoxication, and immediate effect thereof, will render that a sufficient provocation to reduce a killing to manslaughter which would not be so in the mere absence of such intoxication or effect, but, on the contrary, as between murder in any degree below the first, and manslaughter, such intoxication plays no part, the only purpose for which it is admissible being to show an absence of the premeditated design, or that the killing was not murder in the first degree, and the consequence is, that the only effect of proof of such intoxication as to render the accused incapable of such intent will be to reduce the killing to murder of the second or third degree according to the circumstances.

We think the first sentence of the instruction was too broad, and was calculated to mislead. It at least did not submit to the jury the consideration of the effect of intoxication upon his capacity to form the premeditated design to kill. As the judge saw fit to charge upon the question of intoxication, it was material to the accused that he should have had the benefit of this view, since he was charged with murder in the first degree.

The second sentence is erroneous in that it says that the law presumes that a person who is sober enough to form the intention to shoot another and actually does kill him without justification or excuse, is sober enough to form a premeditated design to kill the person shot, and in such case he is criminally liable

for his acts. It is true that a person who is sober enough to form the intention to shoot, and does shoot and kill another, without excuse or justification, is criminally liable according as the law defines the offense and fixes the liability, but the shooting a person intentionally and killing him is not necessarily the same as doing so with a premeditated design to kill him. There may be intention without its having been premeditated; (State vs. Johnson, 41 Conn., 585; Keenan vs. Commonwealth, 44 Penn. St., 45; Kelly vs. State, 3 Smedes & M., 518; Roberts v. People, 19 Mich., 401;) and the fact that the evidence may satisfy the *jury* that a person is sober enough to form the intention to shoot, may not satisfy them that he was sober enough to form a premeditated design to kill. They may believe that the intoxication was such as to prevent the deliberation necessary to form a premeditated design, and yet not believe that it was sufficient, to prevent an intentional shooting. It is true that the law presumes a sober man to intend what he does, but the law does not presume a killing with a premeditated design; this, like every other element of murder in the first degree, is to be inferred by the *jury* from the facts proved. Dukes vs. State, 14 Fla., 499.

The third sentence, viewed in the light of the law given above, is, in its application to murder in the first degree, erroneous. It excludes the idea that by reason of the overcoming influence of intoxication, the accused may be in a condition which renders him in-

capable of forming a premeditated design. Of course if passion and revenge have temporarily dethroned a man's reason, and in this condition he has committed a crime, then the fact that he is intoxicated must necessarily not have played any part in the crime, for it is passion or revenge, and not intoxication, that have effected his reason.

VI. The defendant requested the judge to charge the jury: If you believe from the evidence that the deceased has threatened to take the life of defendant, and that such threat had been communicated to defendant, and that at the time the defendant shot the deceased, the latter had his left hand on defendant and his right behind him, the deceased, then you may consider whether such facts would be sufficient to warrant the defendant to apprehend that his life was in danger, or that he was at the time in danger of great bodily harm. The court refused to give the instruction as proposed, but added thereto the following: You should be satisfied that at the time defendant shot, the deceased had his right hand behind him, and the defendant honestly believed that the deceased then intended to use a deadly weapon on him, and should consider all the facts and circumstances proven, to ascertain whether there was apparent imminent danger of great personal injury being accomplished by the deceased against the defendant, and that defendant then and there shot deceased under an honest belief that it was necessary to protect himself.

The charge requested was erroneous. It excluded from the jury all the other circumstances 'of the killing testified to. It is objected that the addition to the charge took "from the defendant the right to act upon the appearances of bodily harm from the deceased, and restricted the defendant to the fact of his belief that the deceased was in the act of using and then intended to use a deadly weapon on him, for justification or excuse." In view of what follows in this instruction, after the use of the term "deadly weapon," we are not satisfied that the objection to the charge is tenable. It seems to us to present directly to the jury the right of the prisoner to act on appearances of great bodily harm, which had also been referred to in the general charge given by the court. However, upon the new trial the judge may modify the expression "deadly weapon," defined by this court to mean any weapon likely to produce death, (Pittman vs. State, 25 Fla., 648, 6 South. Rep., 437,) to any weapon likely to produce death or great bodily harm, or in any other manner that the *circumstances*, as then shown by the evidence, may require to preserve to the accused the benefit of the reasonable fear of death or such injury.

VII. The only other assignment of error properly involving an exception to the charge, and based on a proper exception, is that as to recommendation to mercy. The Judge instructed the jury as follows: "Should you so find," (meaning, as shown by what preceded, if they found the accused guilty of murder in the first degree,) "and a majority of you, a majority

of your body feel it to be your duty under oaths, you may recommend the prisoner to the mercy of the court. It takes a majorty of your body to make such a recommendation; it is in your discretion, and you may do so if you feel it to be your duty under your oaths.'' The court gave them the form of a verdict with recommendation, and stated the legal consequence attached to such recommendation.   The language quoted above is objected to, it being urged that the statute and a juror's oath fix and settle his duty without any statement from the bench calculated to influence him in any way in discharging it.

In Newton vs. State, 21 Fla., 53, 99-101, this court held, in effect, that counsel may read the act to the jury; and also that if a Circuit Judge deems it necessary to charge on the statute, his charge should be in the language of the act, and that the statute does not either make it his duty to charge, or prohibit him from doing it.   In Newton's case the judge gave his views of the act, which in short, were, that the recommendation should be founded on mitigating circumstances shown by the evidence, and was not to be made simply from tender feeling as to the capital punishment, or sympathy for the accused, and this court remarked that it was improper for the Circuit Judge, after stating that the recommendation is in the discretion of the juries, to attempt to control them in its free exercise according to their own judgment of the merits of the case.

We are not prepared to say that the language ex-cepted to would have influenced the jury. We presume the idea of counsel is, that the jury might have found in the reference to their oaths a caution against recommendation, and we do not say that such a caution could not potently, though unintentionally, conveyed by the intonation of the voice in the use of it and the accompanying words, but there is, of course no intimation of this kind, and such a thing is never to be presumed. However, the purpose of the act is, that a majority of the jury may, if they deem it proper, recommend to mercy, and that it shall have the effect stated, and the duty of the judge is best performed by simply stating the terms of the act to the jury, and telling them that the making or withholding the recommendation is a matter which the law has placed entirely within the discretion of a majority of them. We would not hesitate to reverse a case where it appeared either from the charge, in so far as it bore on this point, or from such part considered with others, that the jury might have been influenced in the use of their discretion, by something falling from the judge.

The judgment must be reversed, and the cause will be remanded for a new trial.